### W. S. TYLER CO. v. DEUTSCHE DAMPFSCHIFFFAHRTS GESELL-SCHAFT HANSA, BREMEN, GERMANY, et al.

(District Court, N. D. Ohio, E. D.   November 10, 1921.)

No. 672.

War ⬥⟞12—Unliquidated claim against alien enemy not a "debt" within the Trading with the Enemy Act.

A shipper's unliquidated and unproved claim against an alien enemy owner of a steamship for value of goods shipped, before commencement of war with a nation of which such owner was a subject, *held* not a "debt" within the Trading with the Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), as amended June 5, 1920, providing that one to whom a "debt" may be owing from an enemy whose property shall have been seized and impounded may recover the amount thereof from the alien property custodian, since a "debt" within such statute must be an amount which is fixed, or which may be definitely ascertained, independently of extraneous circumstances, and not a claim for an unliquidated amount.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debt.]

In Equity. Suit by the W. S. Tyler Company, a corporation, against the Deutsche Dampfschifffahrts Gesellschaft Hansa, Bremen, Germany, and others. On defendant's motion to dismiss. Motion sustained.

Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, for plaintiff.

Thomas W. Miller and Frank White, Jos. C. Breitenstein, Asst. U. S. Atty., of Cleveland, Ohio, and Dean Hill Stanley, Sp. Asst. Atty. Gen., for defendants.

WESTENHAVER, District Judge. This is a suit in equity, brought against the Alien Property Custodian and the Treasurer of the United States pursuant to section 9, act of Congress approved October 6, 1917, known as the Trading with the Enemy Act (Comp. St. 1918 Comp. St. Ann. Supp. 1919, § 3115½e) and as amended June 5, 1920 (41 Stat. 977). Plaintiff's petition, in addition to the necessary jurisdictional averments, alleges in substance that, on or about July 7, 1914, it shipped by the steamer Rauenfels, a vessel owned by an alien enemy, the Deutsche Dampfschifffahrts Gesellschaft Hansa, certain wire screen and iron netting of the value of $2,532. 26, such shipment being made from the port of New York and consigned to a certain consignee in Port Natal, Africa; that when the steamer arrived in sight of its destination it was sighted by a British cruiser and driven ultimately into the port of Brahia, Brazil; and that at this last-named port certain parts of the cargo, including this wire screen and iron netting, were sold to defray the expenses of said steamship and its crew. Plaintiff alleges that it was damaged in the sum of $2,532.26, which by this suit it seeks now to recover from money of the alien enemy owner of said steamship seized by the Alien Property Custodian and now in possession of the Treasurer of the United States. Defendants incorporate in their answer a motion under new equity rule 29 to dismiss on the ground that a cause of action is not stated. This motion, having been heard, is now the matter to be decided.

Whether a cause of action in the plaintiff is stated by the allegations above summarized, against the alien enemy owner of said steamship, it is not necessary to decide, since the parties have argued only one question arising on motion. The material considerations on this motion are that plaintiff's right to recover and the amount of its recovery depend upon facts which are or may be disputed, and can be determined only by a trial of the issue of liability and an assessment of damages. A carrier by sea, it is conceded, is generally held responsible for all losses of cargo except such as are inevitable, including perils of the sea, and such as arise from the act of God or the public enemy, and if the loss is not total, apportionment is to be made under the rules of general average. See 36 Cyc. 236–242; Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960; Allanwilde Corp'n v. Vacuum Oil Co., 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15. Thus it clearly appears that, although plaintiff's cause of action may grow out of a breach of a contract to carry safely, the carrier's liability for that breach may depend on negligence, and that in this case both the plaintiff's right to recover and the amount of its recovery are unestablished and unascertained, depending upon what may be shown by evidence.

Defendants' contention, and the only proposition argued by counsel, is that section 9, as amended, of the Trading With the Enemy Act,

under favor of which alone this suit is brought and can be maintained, authorizes and permits a suit in equity only to recover a debt due and owing to the plaintiff from an alien enemy whose property has been seized and impounded. More specifically, this contention is that the word "debt" as used in that act includes such liabilities only as are within the usual and accepted legal meaning of the word "debt"; that is to say, liquidated demands or sums of money due by certain and express agreement, or, in other words, sums of money reduced to a certainty or susceptible of being reduced to a certainty as distinguished from uncertain or unliquidated damages yet to be determined. Plaintiff seems to concede that liabilities for pure tort damages are not included, but insists that liabilities arising out of breaches of contract are included, even though the amount of such damages remains to be determined upon conflicting evidence. This difference of view must be settled by an examination of the provisions of section 9 as amended June 5, 1920.

Both the original and amended sections are too long to quote in full. The most material, if not the only material, part thereof is as follows:

"That any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian * . * * or to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed," etc., "may file with the said custodian a notice of his claim," etc.

Authority is thereupon given the President to order the surrender or payment to the claimant in accordance with his demand. Provision is also made for suit in equity against the Alien Property Custodian or the Treasurer of the United States in the event of the failure or refusal of the President to make such an order. It will be observed that plaintiff's right to relief depends on whether or not its claim falls within the meaning of the words "to whom any debt may be owing." The word "debt" is used again three times in this section. Once the expression is "debt so claimed"; again, "nor any debt allowed under this section to any person"; and, lastly, "nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917."

Counsel for defendants insist that this word must be given its ordinary and usual meaning, as has already herein been briefly defined. This word "debt," it is urged, is found in a statute carefully prepared, presumptively by persons learned in the law and familiar with the legal meaning of a debt as distinguished from a mere liability, and that if nothing appears from the context or other provisions of the section or the entire act indicating a broader or different meaning, then the courts in construing and applying the act must adopt its correct legal definition. These arguments appear to be sound. An examination of original section 9 as amended, as well as the entire act and the several amendments thereto, discloses internal evidence that it was carefully drafted, and in other respects accurate use is made of technical legal terms. Nothing appears therein tending to enlarge the ordinary meaning of the word "debt." On the contrary, such aid as

is thus obtained tends to support the conclusion that it was used with its usual legal signification. Thus, paragraph C, amended section 7, in describing the property of aliens which the President shall seize, uses the following words:

"Choses in action and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy." (Comp. St. Ann. Supp. 1919, § 3115½d).

It furnishes evidence that the draftsmen of the act were familiar with and knew how to make use of legal terms adequate to describe and include any and all kinds of liabilities owing from one to another, as well as mere debts. If this language had been used in section 9 instead of the word "debt" or in addition thereto, no doubt would exist that plaintiff's cause of action was included. The omission of these or similar words after the word "debt" in section 9 is therefore entitled to great weight.

Furthermore, paragraph F, amended section 9, repeating a provision of original section 9, is not without weight. It is:

"Except as herein provided, the money or other property conveyed, trans-ferred, assigned, delivered, or paid to the Alien Property Custodian, shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court."

Here again we find a number of technical legal terms clearly and accurately used and definitely and specifically expressing the thought the draftsman of the act had in mind. They are typical of the skill with which use is made of legal terms throughout the entire act. This provision expressly limits rights and remedies of persons having debts, claims, demands or liabilities against alien enemies, so that except as a right or remedy is conferred by the preceding provisions of section 9 all such persons are without right or remedy. They are remitted either to the common-law remedies such as exist during or after the end of a war between citizens of separate and independent states or to such redress as the President and Senate in negotiating a treaty of peace, or Congress in disposing of seized property and funds, may in their sound discretion see fit to provide.

Upon careful reflection I am of opinion that the word "debt" is used in section 9 with its usual and definite legal meaning. It should and must be thus construed unless from the context or some other part of the act a different and broader meaning appears to have been given it. This does not so appear. On the contrary, upon a consideration of the context and of all the provisions of the act it appears that it was the intention of Congress to confine and limit the word to its usual and ordinary legal meaning. The reason therefor seems plain. A debt, as legally defined, is a sum of money due by certain and express agreement such as was recoverable at common law in the well-known action of debt. It is no doubt broad enough to include penalties or forfeitures provided by statute or judgments of courts of record. It may in some instances include the proceeds of property wrongfully converted yet in the wrongdoer's hands. It is, however, of the essence of a debt that the amount is fixed or may be definitely ascertained in-

dependently of extraneous circumstances and without the intervention of a jury. Sound reasons exist why Congress should have been willing to authorize the President to pay liabilities the amount of which was fixed and certain, and neither the obligation to pay on the part of the alien enemy nor the amount thus to be paid depended upon extraneous evidence or circumstances requiring a decision both as to liability and amount upon conflicting evidence, and should have denied the power and withheld the burden when they did. Congress in its wisdom would seem to have decided that it was not wise in the latter case either to vest this power in the President or to burden him with the performance of this difficult duty. The right to sue depends upon the President's failure or refusal to order payment. The right of suit in the event of such failure or refusal is no broader or different as respects the nature of the claimant's demand than is the power and duty vested in the President.

Extended citation of authority is not required to show that plaintiff's demand is not in law a debt, but is at best a mere liability. It will be sufficient to refer to standard texts and a few well-considered cases. 3 Black. Com. 154; Black's Law Dictionary, 334; Anderson's Law Dictionary, 315; 18 Cor. Jur. 2; Stockwell v. U. S., 13 Wall. 531, 542, 20 L. Ed. 491; Clinton Mining & Mineral Co. v. Beacon (3 C. C. A.) 266 Fed. 621; Jackson v. Bell, 31 N. J. Eq. 554; Gray v. Bennett, 3 Metc. (Mass.) 522; Duncan v. Lyon, 3 Johns. Ch. (N. Y.) 351, 8 Am. Dec. 513; Holbrook v. American Insurance Co., 6 Paige (N. Y.) 223; Howlet v. Strickland, Cowp. 56; Lindsay v. King, 23 N. C. 401; Baum v. Tonkin, 110 Pa. 569, 575, 1 Atl. 535; Little v. Dyer, 138 Ill. 272, 27 N. E. 905, 32 Am. St. Rep. 140.

Certain cases arising under bankruptcy, attachment, and similar statutes are cited on behalf of plaintiff in which the word "debt" is given a meaning broad enough to include unliquidated damages arising out of contract, either express or implied. Of these cases, Gray v. Bennett, supra, may be taken as a good illustration. An examination thereof, speaking generally, shows that the broader meaning was given only because the context or other provisions of the law showed that the word "debt" was intended to include obligations and liabilities of that nature. They do not support the proposition that the word "debt," used in a statute, standing alone and thus unaided, is ever given a meaning different from its standard and accepted legal definition.

Defendants' motion to dismiss is sustained.