## NORRIS et al. v. BERGDOLL et al.

(District Court, E. D. Pennsylvania. October 27, 1922.)

### No. 2439.

War ⬅12—Claim for value of legal services rendered is a "debt" protected by Trading with the Enemy Act.

A claim for value of legal services rendered, although not a debt for which at common law an action in debt rather than in assumpsit was maintainable, is a "debt" within the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), so as to be a valid claim against property seized thereunder and held by the Alien Property Custodian.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debt.]

In Equity. Claim by Thomas J. Norris and another, administrators c. t. a. of the estate of D. Clarence Gibboney, deceased, against Grover V. Bergdoll and Thomas W. Miller, as Alien Property Custodian, and others. On motion to dismiss. Motion denied.

Ladner & Ladner, of Philadelphia, Pa., for plaintiffs.
Vincent A. Carroll, of Philadelphia, Pa., for defendants.

### Sur Motion to Dismiss.

DICKINSON, District Judge. The ruling of the pending motion involves a verbal dispute, the discussion accompanying which is always interminable. The case is sui generis in the sense that the present proceeding cannot be maintained unless sanctioned by the act of Congress. The Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) condemned to seizure the property of Grover C. Bergdoll, of whom the plaintiff's decedent is averred to have been a creditor. The act recognizes that among the property seized there may be some which is not properly the subject of seizure. It recognizes also that there may be innocent creditors who may become the victims of the confiscation. It in consequence provides both for an executive order and also for this form of proceeding in relief of such innocent parties. The plaintiffs assert a claim of right under the act of Congress to the remedy now invoked. The respondents deny the existence of any such right.

### The Question Raised.

The question raised arises out of the following fact situation: The plaintiff's decedent is averred to have a just claim against Grover C. Bergdoll, whose property has been taken over by the Alien Property Custodian. The claim is for the value of legal services rendered to Bergdoll. The act of Congress gives a remedy to creditors only when their claim is of the character described in the act as a "debt." It is difficult to even formulate a question which directly presents the point on which the dispute turns without the use of words which would provoke further verbal disputes. Broadly the question is whether a claim

of the character set forth is included in the class of claims defined by the act of Congress. This is too general to be of much aid. Two supposititious claims may be employed to best present the distinction upon which the respondents rely. If Bergdoll had purchased merchandise of any one by an order in writing, and had in the writing made the promise to pay $1,000 therefor (that being the market price), the creditor would have had the right to have brought such a proceeding as has been instituted in the instant case. If, however, he had promised to pay the market price without designating any sum which he was to pay, or if he had simply ordered the merchandise, and it had been delivered to him on his implied promise to pay its fair and reasonable value, then, although the market value was admittedly $1,000 the seller would not have the remedy given by this act of Congress.

The reason advanced for this rather startling distinction is that in the one case the creditor could at common law have maintained an action in debt; in the other he would have been driven to an action in assumpsit. Further amplified, the reason advanced is that in the first case there was an obligation to pay the sum of $1,000; in the second case there was merely a promise to pay the market price, leaving the sum to be determined. Still again the act of Congress uses the word "debt," and in the one case supposed Bergdoll would have owed a debt of $1,000, and in the other there was no "debt," but he simply owed $1,000. The stress of the argument advanced to convince us that Congress chose the word "debt" for the purpose of making this distinction is laid upon what, it is urged, can be gathered from the act itself, that it was drawn by a lawyer to whom the distinction made was well known, and which in consequence he must have had in mind. We are ready to believe that the bill was so drafted. Aside from the internal evidence, the nature of the subject-matter was such as to suggest the value of such assistance. It may be, however, that in framing it he understood he was functioning as a legislator. He was a legislator with a lawyer's learning and training, but he was none the less doing the work, not of a lawyer, but of a legislator.

In construing any legislative enactment, the search for the meaning of the law is sometimes phrased in the query: "What did the draftsman of the Act intend"? This is one way of expressing the thought, but, after all, laws are made to be obeyed, and they cannot be obeyed without being interpreted into acts, and the real quest is to know what the law, as it has been framed, enjoins or what it forbids. Intent in no real sense, other than as indicating the meaning of the law, has anything to do with the construing of it, or, if it has, it is the intent of the Congress or other legislative body which enacted the law, not of the individual who wrote out the draft of the bill, which by such enactment became a law. Almost all words are used in a variety of senses, and at times used by one person in one sense and by another in a wholly different sense. Search always is for the sense which the words have in the law which is being construed. There is what is called "a literary style." All sciences, professions, and callings have their own terminology. To the uninitiated much of it is almost a senseless jargon. This is true of the legal profession as of all others, and the literary style typical of lawyers as well as what has been called the parlia-

mentary style has been the subject of the comments of writers and of discussion before bar associations. The consensus of opinion appears to be that lawyers always manifest mental acuteness and sometimes display common sense. There is a distinction common to the lawyer and the lay mind and recognized in the common speech of the people between claims which arise out of the contractual relations between persons and those which may otherwise arise. We have also the well-known relation of debtor and creditor. Whenever this exists there is always (because there is implied) the existence of a debt. There is no difference in the concept of this between lawyers and other people. It is a necessity of our mentality that the more we know of any subject the more extended is our analysis of it, and our vocabulary enlarges, because we must have more terms in which to express the finer distinctions in which this analysis results. The less we know of a subject the more general and all embracing is our concept of it. The ordinary mind is fully satisfied with the information gained when he learns that some one has broken his leg. To a surgeon this means very little. He by no means is satisfied, but wants to know which of the several bones into which the science of anatomy has divided the leg bones has been broken and the nature of the fracture. This desire for detailed information is characteristic also of lawyers, and when debts are spoken of he wants to know which of the many kinds of debts into which he has subdivided contractual obligations is meant. He must have a name for each class, and such is the poverty of language that he has applied to one class the generic name which in common speech applies to all indifferently. He, it is true, calls a special kind of debt a "debt." When, however, he speaks, not as a lawyer, but as a legislator, he knows the meaning which in common speech the word has, and, as he is telling the common people what they may do or shall not do, he uses the word in the sense in which he knows they will understand it, or he is laying a trap for the unwary. There is every reason to give to legal enactments the meaning which the common well informed mind will get out of them.

The claim in this case is for services rendered. If Bergdoll owed the plaintiffs' decedent for such services, he was indebted to him, and, as the indebtedness is a money indebtedness, it is a debt in every sense, except the technical, and even with them, secondary sense in which lawyers use the term "debt." Counsel for the Alien Property Custodian have submitted in an elaborate brief not merely the argument above outlined, which we have not found to be convincing, but also citations of several decided cases which they present as upholding the view they have advanced. If the construction counsel give to the act of Congress has been given to it authoritatively, we must accept the rulings thus made because the act should have the same construction throughout the United States.

The reported cases to which we have been referred are (among others) Tyler v. Deutsche Dampfschiff-fahrts Gesellschaft Hansa, Bremen, Germany (D. C.) 276 Fed. 134; Little v. Dyer, 138 Ill. 272, 27 N. E. 905, 32 Am. St. Rep. 140; Wentworth v. Whittemore, 1 Mass. 471; Atlas Bank v. Nahant Bank, 3 Metc. (44 Mass.) 581; Clinton v. Beacom, 266 Fed. 621, 14 A. L. R. 263.

We cannot see that any of these cases support the position here taken. The Tyler Case was ruled upon the distinction between a debt and a money liability for a tort. The Little Case was the question of the authority of the clerk of a court to enter a judgment. Of the remaining cases we have had access to the report only of the case of Clinton v. Beacom. The distinction between that case and the one before us is clear, and all the cited cases emphasize the grounds of the distinctions made.

It is easy to understand why Congress was moved not to include innocent creditors in the pains and penalties imposed by this act. It is impossible to understand why Congress should make a difference between the two classes of creditors we have indicated in the supposititious cases presented. It is clear Congress was not moved, and we can understand why it was not moved to show a like indulgence to those having claims for damages arising out of torts.

The doctrine of the Little Case is one of general acceptance. The entry of a judgment when the obligation of debt is legally certain and the sum is fixed is a mere clerical act; when the sum must be judicially found, it is a judicial act.

In the Clinton Case, a policy of the law was involved. It was a wise policy to make stockholders answerable under certain circumstances for the debts of a corporation; the same policy would not make them answerable for torts. Indeed, this case, if the record were inspected, would doubtless disclose that it denies rather than supports the contention of the defendants here because it is probable its facts would show that no distinction was made between the debts owing by the corporation.

The remaining case to which we have been referred is the unreported case of Rockwood v. Miller, No. 39898 in the Supreme Court for the District of Columbia. Unfortunately we have no expression from that court of the grounds on which the ruling was made. It is true that the claim presented appears to have been substantially like that presented in the instant case. Why the disposition which was made of the motion to dismiss in that case was made we do not know. For aught we know, it may have been based upon some ground which is not here present.

One other question has been suggested to arise, but, as the argument has been restricted to the question above discussed, we confine ourselves to that.

Our conclusion is that the motion to dismiss should be denied, but, to give definiteness of date to the order made, we do not now make any order, but either party has leave to submit a formal order in accordance with this opinion.