SHEARER v. PORTER, Price Adm'r.

No. 13178.

Circuit Court of Appeals, Eighth Circuit.

April 25, 1946.

Bryan Purteet, of St. Louis, Mo. (Joseph C. Hopewell, of St. Louis, Mo., on the brief), for appellant.

Samuel Rosenwein, Atty., Office of Price Administration, of Washington, D. C. (George Moncharsh, Deputy Adm'r for Enforcement, Milton Klain, Director, Litigation Division, and David London, Chief, Appellate Branch, all of Washington, D. C., and James D. Dockery, District Litigation Atty., of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The Administrator, Office of Price Administration, sued Shearer, an automobile dealer of St. Louis County, Missouri, for treble the amount of excess over applicable ceiling price under OPA Regulation "Revised Price Schedule 85", as amended,[1] charged in the sale of 20 passenger automobiles. The District Court, at the close of all the evidence, directed a verdict for the Administrator in the sum of $9,243.15, the full amount prayed, and Shearer has appealed, alleging error in taking the case from the jury and in the excluding of evidence.

The suit was one under section 205 (e) of the Emergency Price Control Act of 1942, as amended, 58 Stat. 640, 50 U.S.C.A.Appendix § 925(e). The sales had been made in June and July of 1943. The purchaser was another automobile dealer. The automobiles were used cars, but the Regulation treated all 1942 models (which were the last civilian cars permitted to be manufactured during the war) as new cars for purposes of ceiling-price formula.

Under RPS 85, as amended, the retail ceiling price on such automobiles was calculated by adding the following items: (a) the manufacturer's list price; (b) a federal excise tax allowance; (c) an amount equal to freight charges from the factory to the dealer's place of business; (d) an allowance of 5% on the list price and freight charges, or $75, whichever was lower; and (e) an allowance equal to 1% of the list price, or $15, whichever was lower, for each calendar month elapsing after January 31, 1942, before the delivery to a purchaser. Item (d), however, was subject to being included only, "Provided, That * * * the automobile shall have received the operations set forth in [the Regulation, and designated 'Standard Delivery Operations'], as therein required, and at the time of delivery the seller shall deliver to the purchaser a copy of [the Regulation's prescribed operations] and shall execute and deliver to the purchaser and to the Office of Price Administration the certification set forth in [the Regulation]", indicating that such operations had been performed. Item (e) similarly was conditioned: "Provided, That no allowance whatsoever under this paragraph (e) shall be included in the maximum retail price unless the automobile sold shall have received while in storage maintenance operations set forth in [the Regulation] and the seller shall at the time of delivery execute and deliver to the purchaser and to the Office of Price Administration the certification set forth in [the Regulation]."

Item (d) could accordingly not be included in calculating the maximum sell-

---

[1] See 7 Fed.Reg. 664; 7 Fed.Reg. 1675; 7 Fed.Reg. 6897; 8 Fed.Reg. 1450.

ing price, except where the specified delivery operations had been performed and a certification of that fact was furnished. Item (e) similarly was not includable, without performance of the specified maintenance operations and the furnishing of certification to that fact.

It is admitted that Shearer added allowances under paragraphs (d) and (e) into the selling price of each of the cars involved, and there is no dispute as to the amounts so added. The evidence is conclusive that he did not furnish any certification as to the performance of the operations for which they were includable. The testimony of the purchaser further shows, without contradiction, that a number of subsequent requests were made for the certifications but Shearer never furnished them.

■ The adding of allowances under paragraphs (d) and (e) into the selling price without furnishing the certifications required by the Regulation established at least a prima facie case of overcharge against Shearer. Beyond that and in any event, his failure to furnish the certifications on subsequent request and the lack of any proof that the maintenance and delivery operations had in fact been performed left no possible basis in the evidence for him to contend that it was proper to have included the items in the retail selling price of the cars and that there had been no overcharge under the Regulation.

■ But Shearer has attempted to argue that, because the sales were made to another automobile dealer and not to an ordinary retail purchaser, the requirements of the Regulation as to performance of maintenance and delivery operations and certification thereto in computing selling price should not be protectively applied. That argument, however, misconceives the purposes of the Price Control Act and the Administrator's Regulations. The sales were made on the basis of the maximum retail price authorized by RPS 85, as amended, and in order to be authorized to charge that price, with allowances under paragraphs (d) and (e) included as elements, the requirements and conditions of the Regulation underlying these items necessarily had to be met, no matter who the purchaser might be. Whether a purchaser has had closed or open eyes in buying goods obviously does not alter the inflationary effect of an increased price, and it has not been made a factor in the Administrator's right to correct the public harm.

■ Shearer also has argued that he was not obligated to perform maintenance and delivery operations and make certifications thereto, because he had purchased the cars from other automobile dealers, had owned them only a short time, and had kept them on sales lots and not in storage. The question here is not as to his obligation to perform the operations and make certifications thereto but as to his right to include in the selling price an allowance on the basis that these things had been done. He says that the other automobile dealers had added the items into the prices which he paid them and argues that he therefore should be entitled to pass the charges along. But, if the statute or the Regulation had permitted bald accretions from mere inter-dealer transactions, all effort to prevent inflationary prices would soon be meaningless. If the other dealers had performed the operations, while they owned the cars, and had made certifications thereto in the sale of the cars to Shearer, they were entitled, of course, to include the items as elements in their selling price. And Shearer in turn would have the right, as to the maintenance operations at least, to pass the certifications which he received along to his purchaser, supplemented by certifications of his own as to the continuance of the operations, while he held the cars, if this was in fact done. If the maintenance operations had not been performed and certified to by the other dealers, the fact that Shearer had paid a price which included an allowance therefor would not give him the right to include the item in the selling price to his purchaser.

■ Attention is called in Shearer's brief to the fact that on February 11, 1944, (subsequent to the present transactions) the Administrator made an amendment to RPS 85, which authorized the inclusion of the 1% allowance per month under paragraph (e), "without the performance of the maintenance operations * * * for any period that the automobile is kept in a customary sales room on display for sale, or is used as a demonstrator, company owned or executive car." Presumably the amendment was made on the theory that such cars normally would receive general care and treatment which would serve

the purpose of the maintenance operations and would prevent any possibility of standing deterioration and depreciation. Whether the amendment constituted a clarification or a change in the Regulation, it is not necessary to consider, for in any event there was no attempt to show that the automobiles were cars that during the period involved had been kept in customary sales rooms on display for sale, or used as demonstrators, company owned or executive cars.

On the present record, we must hold that there was no question for the jury on whether overcharges had been made under the Regulation, or on their amount. The evidence unequivocally established those facts as a matter of law. The only other issue in the case was whether the damages should be multiplied and, if so, how the increase was entitled to be determined. Shearer contends that the court erred in taking the question of increased damages from the jury and in directing a verdict for treble the amount of the overcharges. It was the Administrator's position on the motion for directed verdict that a trebling of the damages was mandatory in the situation, and it is conceded here that it was on this theory that the trial court ordered damages in three times the amount of the overcharges.

We have held in Bowles v. Goebel, 8 Cir., 151 F.2d 671, 673, 674, decided since the present case was tried, that under section 205 (e) of the Emergency Price Control Act of 1942, as amended in 1944, 58 Stat. 640, 50 U.S.C.A.Appendix § 925 (e), the allowance of increased (up to treble) damages and the extent of their amount are matters for the discretion of the court in the particular case, except that the recovery cannot be made to exceed the amount of the overcharge (or $25, if the overcharge is less) in any situation where the defendant has established that the overcharge was neither wilful nor the result of failure to take practicable precautions against its occurrence.

For the court to have viewed the assessment of treble damages as being legally mandatory under the statute and not to have permitted the question of increasing the damages and their amount to be determined on the basis of appraisal of the facts and exercised discretion, as discussed in the Goebel case, was error, for which the judgment must be reversed.

We suggested the query in the Goebel case, 151 F.2d at page 675, without assuming to answer it, whether the language of the Act, "as the court in its discretion may determine", and the perspective obviously necessary and apparently contemplated by Congress, if the Act was to accomplish its national purpose, were intended to make the increasing of the damages a matter for the trial judge rather than for the jury. As to the language, the term "discretion of the court" is not ordinarily one that is applied to jury action. And as to the fact that juries naturally will and can be expected to deal with such cases on the basis of local eyecast rather than inflationary perspective, the recent noticeable increase in demands for jury trials in actions brought by the Administrator together with the results of these trials is perhaps the simplest testimony.

It further should be noted that there is involved in the consideration of the query no aspect of right under the Federal Constitution. The Seventh Amendment is not a guarantee that such discretionary increasing of compensatory damages as a statute may authorize for exemplary or other public-interest purposes shall be done by a jury. The historic function of a jury is to determine issues of fact. Congress has specifically so recognized and it left the right thus limited, when it provided in R.S. § 566, 28 U.S. C.A. § 770, that "The trial of issues of fact in the district courts * * * shall be by jury" (except in equity cases and in cases of admiralty, maritime and bankruptcy jurisdiction unless otherwise provided). Compensatory damage traditionally is an issue of fact, but the discretionary increasing of such damages is not. Almost a hundred years ago, Mr. Justice Grier, in discussing the question of leaving to a jury the matter of increasing actual damages, made the observation in Day v. Woodworth, 13 How. 363, 372, 373, 54 U.S. 363, 372, 373, 14 L.Ed. 181, that "Neither the common law, nor the statute law of any State [up to that time], so far as we are informed, has invested the jury with this power or privilege", and added, with perhaps a tinge of skepticism, that "It has been sometimes exercised by the permission of courts, but it's

results have not been such as to recommend it for general adoption either by courts or legislatures."

A number of statutes, both state and federal, providing for increased or multiple damages, some mandatory and others discretionary, have, of course, been enacted since Mr. Justice Grier wrote. In some states, and possibly most, the question of discretionarily increasing or multiplying the actual damages has been left to the jury, in some instances through legislative prescription and in others by general practice ripening into concept but probably having its root in the common disposition to allow a jury to resolve all difficulties possible. These facts, however, are of little value here. We have said that no federal constitutional question is involved and that R.S. § 566, 28 U.S.C.A. § 770, has not attempted to extend the field of jury determination. Unless, therefore, the present statute has either expressly or by clear implication indicated an intention on the part of Congress that the increasing or multiplying of compensatory damages should be left to a jury, or such an intention convincingly appears to exist, notwithstanding the general provision of R.S. § 566, 28 U.S.C.A. § 770, from a policy adopted by Congress in other such statutes, there is no right here to have the matter so done.

As to the policy of Congress in other such statutes, the first provision for multiple damages appears to have been made in the patent laws. A statute enacted in 1793, 1 Stat. 318, 322, provided that an infringer should be liable in an action on the case for at least three times the amount for which the patentee had usually sold or licensed the use of his invention. In 1800, the provision was made to read, 2 Stat. 38, that the infringer should be liable for "a sum equal to three times the actual damage sustained by such patentee." Mr. Justice Washington, sitting on circuit, in Gray v. James, 1817, 10 Fed. Cas. page 1015, No. 5,718, Pet. C.C. 394, instructed the jury under this statute that, if they found for the plaintiff, they should determine "the actual damages sustained * * * which the court will treble." In 1836, the statute was amended to provide that "whenever, in any action for damages [for patent infringement], a verdict shall be rendered for the plaintiff in such action, it shall be in the power of the court to render judgment for any sum above the amount found by such verdict as the actual damages sustained by the plaintiff, not exceeding three times the amount thereof, according to the circumstances of the case * * *." 5 Stat. 123. The patent laws have ever since contained substantially similar language, R.S. § 4919, 35 U.S.C.A. § 67, which the courts have recognized and applied. See, for example, the expressions in Teese v. Huntingdon, 23 How. 2, 9, 64 U.S. 2, 9, 16 L.Ed. 479; Birdsall v. Coolidge, 93 U.S. 64, 69, 23 L.Ed. 802.

The statute on trademarks also contains a provision in practically identical language, 33 Stat. 728, 15 U.S.C.A. § 96, making the matter of increasing compensatory damages the responsibility of the judge. In the Sherman and Clayton Acts, it is merely provided that a plaintiff is entitled to recover "threefold the damages by him sustained", 38 Stat. 731, 15 U.S.C.A. § 15. We have found no statute where Congress has required or indicated the intention that the matter of increasing or multiplying damages should be left to the jury.

There is thus nothing in the language of the Price Control Act or in the policy of Congress from other increased-or-multiple-damage statutes to require leaving to a jury the matter of increasing damages for price violations, which are either wilful or the result of failure to take practicable precautions against their occurrence. The implication of the language "as the court in its discretion may determine" and the policy of Congress in the other statutes to which we have referred point to the opposite conclusion.

We think, therefore, that the question of increasing the damages and the extent of their amount are intended to be matters for the trial judge rather than for the jury. In any action brought under the Act, all that the court need leave to the jury, if the evidence is such as to warrant the submission, is (1) whether an overcharge has been made under the Regulation, (2) what the amount is, (3) whether it has been proved not to have been wilful, and (4) whether it has been proved not to have been the result of failure to take practicable precautions against its occurrence—the nonexistence of either (3) or (4) being a condition to the court's right to increase the damages. These fact

questions no doubt can most simply and effectively be submitted for determination on special interrogatories and special verdict under Rule 49 (a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on proper instructions.

We are not holding that it would constitute reversible error for the trial judge to leave the matter of increasing the damages to the jury, where this is done under suitable instructions and the judge adopts the jury's action. Thus, in Mail & Express Co. v. Life Pub. Co., 2 Cir., 192 F. 899, 901, it was held not to be reversible error for the court to have left to the jury the question of the amount to be awarded under a provision in the copyright statute, 17 U.S.C.A. § 25, that, where the proof fails to establish the amount of actual damages in such a case, there may be allowed, without such proof, "in lieu of actual damages and profits such damages as to the court shall appear to be just." Ordinarily, however, there would seem to be no reason why the trial judge should thus pass on to the jury the responsibility which the statute appears to contemplate should rest upon his shoulders.

Shearer has contended that the court erred in excluding certain evidence offered by him. We think the evidence as to the bulletins issued by the various trade associations of which he was a member and as to his reliance upon them should have been admitted, as having relevance on the question of his wilfulness or good faith and the extent of practicable precautions. We cannot say that there was error in excluding the testimony of a former "Regional Automotive Specialist" for the War Production Board, as to the information he had given Shearer about necessary maintenance operations, for the offer appears to indicate that the information related to a dealer's duties in car-conservation rather than to his rights in price-charging, and besides, whatever such information may have been, it was not shown to have been given prior to or during the time that Shearer owned the present cars. There was no error in the exclusion of the proof that Shearer had filled out OPA Form R-203 and mailed it to the OPA Inventory Unit, New York, N. Y., at the time of the sale, for this form on its face was intended merely as a report on transfers of ownership of 1942 model cars, to enable the Government to keep track of their disposition and availability, and not to give information as to the price or other details of the transaction. The contentions on other exclusions of evidence do not merit discussion.

We have indicated that the judgment is required to be reversed for the trial judge's error in regarding the assessment of treble damages as being mandatory under the statute and not allowing the question to be determined as a matter of judgment or exercised discretion on the circumstances of the case. We have also said that on the present record Shearer's evidence did not entitle him to have the question of whether overcharges were made and their amount submitted to the jury. We have suggested what seems to us to be the preferable practice and the intent of the Price Control Act in the matter of increasing damages, where the situation is one entitling this to be done. We have further intimated that we are not presuming, however, to dictate to the trial court its procedure on the matter of increased damages, since the submission of the question to a jury under proper instructions and the court's adoption of the jury's action ordinarily could not be claimed to constitute prejudicial error. On a remand of the case, the question of wilfulness and taking of practicable precautions will be subject to re-examination on the basis of the light, if any, from the excluded evidence on trade-association bulletins and reliance thereon, together with the previous evidence and any further facts that may possibly be developed. The circumstances involved in the making of the overcharges are so integrally a part of the question of what increase, if any, should be made in the damages that we feel the case probably can most simply and effectively be disposed of in the trial court by remanding it generally for a new trial.

Reversed and remanded for a new trial.