**CRARY et al. v. PORTER, Price Administrator.**

No. 13384.

Circuit Court of Appeals, Eighth Circuit.

Oct. 4, 1946.

Rehearing Denied Oct. 29, 1946.

C. Floyd Huff, Jr., of Hot Springs, Ark. (Q. Byrum Hurst, of Hot Springs, Ark., on the brief), for appellants.

Albert M. Dreyer, Chief, Appellate Branch, Office of Price Administration, of Washington, D. C. (George Moncharsh, Deputy Administrator for Enforcement, David London, Director, Litigation Division, and Karl E. Lachmann, Atty., Office

of Price Administration, all of Washington, D. C., on the brief), for appellee.

Before SANBORN, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one by the Price Administrator, under section 205(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 925(e), for damages against appellants, as partners, on account of overcharges on 51 shipments of Southern Pine lumber, from July to October, 1945, under section 5(e) of amended Second Revised Maximum Price Regulation 19, 9 Fed.Reg. 1162, 2916. At the close of all the evidence the court sustained the Administrator's motion for a directed verdict against appellants in the sum of $2,788.82, the amount of the overcharges—the Administrator having conceded in connection with the motion that the situation was not one in which increased or multiple damages should be assessed.

Section 5(e) of the Regulation, as then in force, provided: "(e) Inspection certificates required on sales of certain grades. Any shipment of Southern pine lumber priced in Tables 1, 2, 3A, 7, 14, 15, 16A and 21 which does not bear the grade mark of a qualified inspection agency as provided in Federal Specification MM–L–751c (May 20, 1942), must either be accompanied by a certificate of inspection by inspection agency, which has been accepted as satisfactory by any Federal purchasing organization, or be inspected by an inspector from the Federal organization making the purchase, if the shipment contains either (1) 30% No. 1 common and higher grades, or (2) 15% C and higher grades, or (3) 10% B and better. The certificate of inspection must cover all lumber in the shipment. In the absence of such a certificate, where the lumber is not grade marked as specified above, lumber invoiced as No. 1 Common and higher grades in any such shipment may not be sold at prices higher than the prices provided in such tables for No. 2 Common."

Federal Specification MM–L–751c, referred to in the Regulation, which was a part of Federal Standard Stock Catalog, Section IV (Part 5) "Federal Specification for Lumber and Timber," made all lumber associations whose grading rules had been approved by the Central Committee on Lumber Standards as in conformance with "American Lumber Standards," or bureaus of such associations, qualified inspection agencies. According to the evidence, the Southern Pine Inspection Bureau of the Southern Pine Lumbermen's Association was such a qualified inspection agency.

The invoices of appellants, which were put in evidence by the Administrator, showed that each of the shipments involved had consisted of more than 30% No. 1 Common and higher grades of lumber. The evidence further established that none of the shipments (all of which were civilian purchases) had been grade-marked or inspected and certified to by a qualified inspection agency, but the lumber in each instance had been graded by appellants' own inspector and priced to the purchaser on the basis of this grading, the same as if the shipment had been accompanied by a certificate of a qualified inspection agency. There was no attempt to prove any incorrectness in the grading or any complaint from a purchaser, but the Regulation did not allow lumber invoiced as No. 1 Common and higher grades to be sold at prices higher than those fixed for No. 2 Common, if it was not accompanied by the prescribed inspection certificate.

The first contention for reversal is that the court was not entitled to direct a verdict for the Administrator, because the evidence showed that appellants had acted in good faith. It is argued that section 205(d) of the Act, 50 U.S.C.A.Appendix, § 925(d), exempts a seller from liability for violating a price regulation, if he has acted in good faith. Appellants have misread the language and purpose of this section of the statute. The section provides that "No person shall be held liable for damages or penalties * * * on any grounds for or in respect of anything done or omitted to be done in good faith pursuant to any provision of this Act or any regulation, order, price schedule, requirement, or agreement thereunder * * * notwithstanding that subsequently such provision, regulation, order, price schedule,

requirement, or agreement may be modified, rescinded, or determined to be invalid. * * *" Clearly, this provision has application only to things done pursuant to or in conformity with the Emergency Price Control Act and not to things done contrary to or in violation of it, whether in good or bad faith. As the report of the Senate Committee on Currency and Banking declared, Sen.Rep. 931, 77th Cong., 2d Sess., at the time the statute was enacted, "of course Section 205(d) does not confer any immunity upon any person who violates any such provision, regulation, order or requirement." See also Bowles v. Indianapolis Glove Co., 7 Cir., 150 F.2d 597, 600; Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 512–514; Schreffler v. Bowles, 10 Cir., 153 F.2d 1, 4. For any violation of a price regulation, the liability in damages is governed by section 205(e), as amended, 50 U.S.C.A.Appendix, § 925(e), and under that section good faith is in no way a defense to the recovery of overcharges but is relevant only on whether and how much the recovery should be increased beyond that amount in achieving the purposes of the Act. Cf. Speten v. Bowles, 8 Cir., 146 F.2d 602; Shearer v. Porter, 8 Cir., 155 F.2d 77; Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 513, 514.

■ Appellants' second contention is that the Regulation is too ambiguous for understanding and compliance, in that there was "no way of knowing by what inspection agency or by whom the lumber should be inspected." But if appellants did not know what qualified inspection agency there was in the territory and did not have access to Federal Specification MM–L–751c, referred to in the Regulation, they manifestly could have sought information from the nearest OPA office. District Courts and Circuit Courts of Appeals may not refuse to enforce an applicable price regulation with which compliance is not utterly impossible. The reasonableness or unreasonableness of a price-regulation's requirements, as a question of its validity, is a matter that the statute has relegated to the jurisdiction of the Emergency Court of Appeals subject only to review by the Supreme Court. 50 U.S.C.A.Appendix, § 924;

Yakus v. United States, 321 U.S. 414, 427–431, 64 S.Ct. 660, 88 L.Ed. 834; Speten v. Bowles, 8 Cir., 146 F.2d 602, 605; Superior Packing Co. v. Porter, 8 Cir., 156 F.2d 193, 195.

■ The third contention is that the trial court erred in compelling H. A. Crary, one of appellants, over his objection, to take the witness stand. When the Administrator attempted to call Crary as a witness, he refused to take the stand on the ground that under the Fifth Amendment he could not be compelled to be a witness against himself. His theory, while not clearly expressed in the record, apparently was that the demand in the Administrator's complaint for treble damages (which as we have indicated was withdrawn at the close of all the evidence) made the action in the nature of one for a criminal penalty. His brief here quotes the fourth syllabus point from Lees v. United States, 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150, that "An action to recover a penalty under [the Act of February 26, 1885, 23 Stat. 332, prohibiting the importation of aliens under contract to perform labor in the United States], though in form a civil action, is unquestionably criminal in its nature, and the defendant cannot be compelled to be a witness against himself." The trial court ruled that the present action was wholly remedial and civil in nature and that Crary's privilege therefore did not extend to the right to refuse to take the stand generally but only to answer any specific question which might tend to incriminate him. The error, if any, in this ruling would, of course, be one that would be available only to Crary himself and not to the other appellants. The ruling, however, was in our opinion clearly correct.

The question involved is merely whether Congress intended the provision for increased or multiple damages in section 205(e) of the Act as a civil (remedial) or a criminal (forfeitively punitive) sanction. That the provision for the recovery of the overcharges themselves as damages is purely a remedial and hence a civil sanction there can be no possible doubt. And there can be but little more question that the provision for increasing or multiplying the

overcharge-damages equally was intended to be simply remedial and not forfeitively punitive in nature.

In the first place, increased or multiple damages are not authorized to be assessed under section 205(e) as a substitute for criminal punishment. Criminal sanctions for violation of the Act are separately provided for in section 205(b). And, as was said by the Supreme Court in Helvering v. Mitchell, 303 U.S. 391, 404, 58 S.Ct. 630, 636, 82 L.Ed. 917 (in holding that a provision in the Revenue Act of 1928 authorizing an increased recovery of 50%, where income tax deficiencies were due to fraud with intent to evade the tax, was a civil and not a criminal sanction), "The fact that the * * * Act * * * contains two separate and distinct provisions imposing sanctions [one expressly criminal in nature], and that these appear in different parts of the statute, helps to make clear the character of that here invoked." Also significant is the further statement in the Mitchell case, 303 U.S. at page 402, 58 S.Ct. at page 634, 82 L.Ed. 917, "That Congress provided a distinctly civil procedure for the collection of the additional 50 per centum indicates clearly that it intended a civil, not a criminal, sanction."

In addition, mere increased or multiple damages, whether they be for exemplary or other public-interest purposes, whose allowance is dependent upon the recovery of actual damages, have never been regarded as constituting a criminal penalty. See 15 Am.Jur., Damages, § 267, p. 703. A penalty in a sense they may well be, in their practical significance perhaps and to the defendant's mind no doubt, but in legal concept their allowance is simply an incident or part of the remedial sanction of damages. Stockwell v. United States, 13 Wall. 531, 547, 80 U.S. 531, 547, 20 L.Ed. 491, put it thus: "There are many cases in which a party injured is allowed to recover in a civil action double or treble damages. * * * It will hardly be claimed that these are penal actions requiring the application of different rules * * * from those that prevail in other actions for indemnity." To whatever extent, therefore, that it may be argued that double or treble damages in a civil action amount to a penalty, they are, unless the statute otherwise indicates, a mere remedial sanction and do not in any way make the action subject to the rules or privileges of a criminal prosecution. Cf. Helvering v. Mitchell, supra, 303 U.S. at page 400, 58 S.Ct. at page 633, 82 L.Ed. 917, and cases there cited.

But beyond all this in the present situation, on the basis of actual damages alone, besides the immediate injury to a purchaser, the injury to the public economy from an overcharge transaction under the Emergency Price Control Act, in its attritive inflationary effect, could manifestly properly be viewed by Congress as being much greater than the mere amount of the overcharge made and as thus furnishing a direct basis for the allowance of greater damages against the seller, no matter in what form they might be permitted to be recovered [here by increasing or multiplying the amount of the overcharge up to three times], and this whether the recovery was by the Administrator or the purchaser was permitted by the statute to recover for all the damages which the seller had occasioned. In any attempted discussion therefore of whether the provision for increasing or multiplying the amount of an overcharge could be in any sense a real penalty, it would not be possible to maintain that under the statute the seller was being made to pay more than the actual damages which he had occasioned. Such was the view taken in Stockwell v. United States, 13 Wall. 531, 547, 80 U.S. 531, 547, 20 L.Ed. 491, under a statute which permitted a civil recovery for double the value of illegally imported goods, against one who had purchased the goods with knowledge of their illegal importation. The Court there said: "It is, then, hardly accurate to say that the only loss the government can sustain from concealing the goods liable to seizure is their single value, or to assert that the liability imposed by the statute of double the value is arbitrary and without reference to indemnification. Double the value may not be more than complete indemnity."

It perhaps should be observed also, before passing to appellants' next contention, that, while we have dealt on its merits

with the question whether the provision for increased or multiple damages could be contended in any sense to be a criminal sanction, appellant Crary, even if it had been, would not on that ground have been entitled to a reversal, because any error that could possibly have inhered in requiring him to take the witness stand would in any event have been wholly dissipated from the proceeding on the Administrator's subsequent withdrawal of the demand for increased or multiple damages.

For their fourth contention, appellants argue that the court erred in refusing to quash a subpoena duces tecum requiring them to produce certain documentary evidence at the trial, because it had been issued without an order of the court. Subdivision (d) of Rule 45, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, contains a provision that "A subpoena commanding the production of documentary evidence on the taking of a deposition shall not be used without an order of the court," but in subdivision (b), which has application to subpoenas duces tecum for trial purposes, there is no such requirement and such a subpoena recognizedly may be issued as of course. Cf. 3 Ohlinger's Federal Practice, Annotation to Rule 45, p. 580 et seq.; 3 Moore's Federal Practice 3087. If the subpoena is unreasonable and oppressive, the Rule authorizes the filing of a motion to quash.

The fifth contention made is that the court erred in striking an amendment to appellants' answer, whose purport was that subsequent to the sales here involved the Administrator had amended the Regulation and increased the prices on No. 2 Common lumber to the level of those which appellants had charged on the shipments in suit and that the Regulation as it existed at the time of the sales had thus lost its legal effect, no violations of it would survive, and the present action could accordingly not be maintained. This did not state any defense. The amending or revoking of a price regulation by the Administrator does not wipe out either criminal or civil liability under the Act for any violation occurring while the provisions of the regulation were in effect.

In United States v. Hark, 320 U.S. 531, 536, 64 S.Ct. 359, 362, 88 L.Ed. 290, the Supreme Court said: "We hold that revocation of the [price] regulation did not prevent indictment and conviction for violation of its provisions at a time when it remained in force. The reason for the common law rule that the repeal of a statute ends the power to prosecute for prior violations is absent in the case of a prosecution for violation of a regulation issued pursuant to an existing statute which expresses a continuing policy, to enforce which the regulation was authorized." In Bowles v. Jones, 10 Cir., 151 F.2d 232, 234, it similarly was held as to civil liability under the Act that "the revocation of the revised regulation did not extinguish the liability which accrued while it was in effect." Indeed, Congress itself went so far in making clear its intent on the continuing character of liability under the Act, as to provide in 50 U.S.C.A.Appendix, § 901 (b), that, even on the termination of the Act, "as to offenses committed, or rights or liabilities incurred, prior to such termination date, the provisions of this Act and such regulations, orders, price schedules, and requirements shall be treated as still remaining in force for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability, or offense."

Appellants' final contention is that a motion to dismiss the action, made by them early in the proceedings, was erroneously denied. The gist of their argument here is that there was no allegation or showing that the shipments of lumber were in any way actually upgraded; that there accordingly was no real overcharge; and that it therefore was immaterial that they had not furnished the inspection certificate of a qualified inspection agency. The Regulation did not compel appellants to furnish such inspection certificates, but it authorized the charging of a certain price only if the certificates were furnished. What we said in Shearer v. Porter, 8 Cir., 155 F.2d 77, 80, where automobiles had been sold at a price permitted to be charged only if a certificate was furnished the purchaser showing that certain mainte-

nance operations had been performed, is applicable in principle and is here sufficient: "The question * * * is not as to his [seller's] obligation to perform the operations and make certifications thereto but as to his right to include in the selling price an allowance on the basis that these things had been done."

The judgment is affirmed.