**PORTER v. BLEDSOE et al.**

No. 5520.

Circuit Court of Appeals, Fourth Circuit.

Jan. 8, 1947.

PARKER, Circuit Judge, dissenting in part.

———◆———

Abraham .H. Maller, Sp. Appellate Atty., OPA of Washington, D. C. (George Monscharsh, Deputy Adm'r for Enforcement; David London, Director, Litigation Division, and Albert M. Dreyer, Chief, Appellate Branch, all of Washington, D. C., and Edward N. Vaden, Regional Litigation Atty., OPA, of Atlanta, Ga., on the brief), for appellant and cross-appellee.

Russell M. Robinson and Charles A. Hines, both of Greensboro, N. C. (Norman A. Boren, of Greensboro, N. C., on the brief), for appellees and cross-appellants.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The Price Administrator brought an action in the District Court under Section

205(e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 925(e), to recover damages from the defendants because of sales in excess of maximum prices established by Revised and Second Revised Maximum Price Regulation 19 and amendments thereto, 8 Fed.Reg. 5536; 9 Fed.Reg. 1162. In addition to the statutory damages the Administrator prayed for an injunction to restrain the defendants from further violations of the Act. The cause was tried without a jury, judgment was entered for the Administrator in the sum of $19,577.15, and an injunction was issued. Both sides have appealed with respect to the amount of the recovery.

Defendants are wholesale lumber dealers engaged in the buying and selling of southern pine lumber at Greensboro, North Carolina. It was their practice to refer to certain lumber mills the orders that they received and to have the lumber shipped direct from the mill to the purchasers. The shipments were invoiced to the defendants by the mill, with quantities and grades shown on the invoices, after which defendants issued new invoices to their purchasers in the same manner with proper prices for the quantities and grades shown including a 6 per cent mark-up authorized by the regulation. The defendants neither saw nor inspected the lumber shipped, although all shipments were subject to inspection before acceptance by the consignee in accordance with the trade practice of the lumber industry and the rules of the Southern Pine Association. By reason of this method of doing business an opportunity was presented to the mill to ship to the consignees grades of lumber lower than those specified in the invoices sent to the defendants and thereby to violate the regulations and pertinent provisions of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq. These violations on the part of the mill were not immediately detected by the defendants, nor is this difficult to understand under the circumstances inasmuch as the consignees, because of the existing shortage of lumber, were quite willing to accept whatever was sent them, even though the invoiced price was in excess of the maximum price chargeable for the grade of lumber received.

Under subparagraph (e) added to Section 5 of Revised Price Regulation 19 on November 15, 1943, it was required that certificates of inspection signed by a qualified inspection agency must accompany each shipment of certain grades of southern pine lumber. Prior to that date no such certificate of inspection was required, but a proper grading by a competent inspector was necessary, though not by an inspector officially certified as provided in Section 5(e). During both periods, the inspection and grading of the lumber was shown in the documents sent by the mill to the defendants, and it is urged by way of defense that in the absence of knowledge to the contrary, defendants had the right to rely on the inspection certificates and the invoices as to the actual grade of lumber shipped. It is to be noted that defendants do not dispute that they were sellers; nor do they attempt to controvert the fact, as found by the court below, that the lumber was improperly graded in violation of the regulation.

The District Judge was not impressed with defendants' argument. He held as a matter of law that a wholesale dealer, selling lumber for direct-mill shipment from the mill to the customer, is responsible for any failure to grade properly at the mill even though he has no knowledge of such failure and no reason to suspect it. The judge applied this rule both as to shipments prior to November 15, 1943, assessing the damages at $6,075.19, and as to shipments between November 15, 1943 and March 1, 1944, for which a recovery of $4,514.69 was adjudged. In each period the award was limited to the overcharge, and treble damages were not allowed since the court found that the violations prior to March 1, 1944 were neither willful nor the result of a failure to take practical precautions against them. As to the goods shipped after March 1, 1944, the court found that the defendants were put on notice that the law and the regulations were being violated by the mills; and as to these shipments, recovery was allowed in the sum of $8,987.27. Recovery as to these shipments was also limited to single damages since the defendants never had physical possession of the goods and derived only a limited profit from the trans-

actions. Liability on these shipments is conceded by the defendants, but they argue that recovery should be limited to the difference between commissions actually received and commissions that would have been received had they been based on proper prices. In other words, the defendants claim that they are liable only for the profit received and not for the amount of the overcharge. The shipments above mentioned are the subject of the defendants' appeal.

The paramount question is whether the defendants are liable for the overcharges if it is not shown that they had knowledge that the lumber was below the grade shown by the invoices. Section 2(a) of the Second Revised Maximum Price Regulation 19 provides: "This regulation covers, under the name of 'sales for direct-mill shipment' all sales of southern pine lumber, no matter who the seller is, and regardless of the quantity involved, except sales of southern pine lumber, which was part of the regular stock of a distributing yard at the time the sale was made."

■ This regulation is clearly intended to cover the kind of business done by the defendants since it relates to all sales for direct-mill shipment, no matter who the seller is. We think also that it places responsibility for the sale upon the mill and the wholesaler alike; for, although the regulation is silent on the point, it seems unreasonable to us to suppose that the Administrator, in promulgating the rule under his authority to issue such regulations as he might deem necessary or proper to carry out the purposes of the Act, intended to allow a wholesaler to rely with impunity upon information furnished by the shipper. If the regulations were given this broad interpretation, it would be easy for the wholesaler to evade the law in all cases where he did not see the goods before they were shipped. His right to rely upon the invoices and certificates of inspection of the shipper would present always an avenue down which he might escape both the requirements of the regulation and the sanctions imposed for a violation thereof; and his freedom would be doubly assured in the light of the difficulty inherent in proving knowledge on his part of the violation by the shipper. See the decision rendered by the Fifth Circuit on December 2, 1946 in East v. Bowles, 158 F.2d 227, where a similar conclusion was reached. See also United States v. Bruno, 67 S.Ct. 211; United States ex rel. Bowles v. Seidmon, 7 Cir., 154 F.2d 228.

The defendants rely upon Bowles v. Jung, D.C.S.D. Cal., 57 F.Supp. 701, in which the court passed upon a claim of the Administrator to recover an overcharge from an intermediate seller of citrus fruit. The applicable regulation provided in effect that the base price of the intermediate seller should be the base price furnished or reported to him by his supplier and permitted the intermediate seller to add a specified mark-up. The court held that these provisions did not make it the duty of the intermediate seller to ascertain whether the supplier had computed the price correctly but entitled the intermediate seller to rely upon the information furnished him. There is no corresponding language in the regulation which controls the pending case, and consequently the decision of the District Court does not conflict with that in the cited case.

■ Furthermore, there is language in Section 205(e) of the Emergency Price Control Act which shows that Congress did not overlook the possibility that a seller may violate a regulation by an unintentional overcharge. In such a case the statute provides that the amount of the recovery shall be the amount of the overcharge or $25, whichever is greater, if the defendant proves that the violation was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation. It follows that one who makes an overcharge innocently is liable for the amount thereof unless there be some contrary provision in the regulation applicable to the particular case.

■ This clear provision of the statute also contains the conclusive answer to the defendants' contention that recovery in the pending case should have been limited to the amount of the commissions received by them and should not extend to the amount of the overcharge. The courts have consist-

ently held that even though both mitigating elements mentioned in the statute are proved, an assessment of at least single damages must be made since under the Act good faith is not a defense to a recovery of the overcharge but serves only to limit the recovery to the amount thereof. See Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 514; Crary v. Porter, 8 Cir., 157 F.2d 410, 413; Bowles v. Indianapolis Glove Co., 7 Cir., 150 F.2d 597, 600. See also Bowles v. American Stores, Inc., 78 U.S.App.D.C., 238, 139 F.2d 377, 378, certiorari denied, 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565.

■ Nor may defendants find refuge in Section 205(d) of the Act, 50 U.S.C.A.Appendix, 925(d), for clearly the reference to good faith therein has application only to acts done pursuant to or in conformity with some provision of the Emergency Price Control Act which may have been modified, rescinded or held to be invalid. The provision does not relate to acts in derogation of the statute. See Report of the Senate Committee on Currency and Banking, Sen. Rep.No. 931, 77th Cong., 2d Sess. (1942), stating at the time the statute was enacted: " * * * of course Section 205(d) does not confer any immunity upon any person who violates any such provision, regulation, order or requirement." See also Crary v. Porter, 8 Cir., 157 F.2d 410; Schreffler v. Bowles, 10 Cir., 153 F.2d 1.

The defendants also depend on such cases as Bowles v. Assad, D.C., W.D.Pa., 56 F.Supp. 8, and Bowles v. Arlington Furniture Co., 7 Cir., 148 F.2d 467, in which the court denied the application of the Administrator for an injunction against a person who had unwittingly participated in the sale of goods upon which an overcharge had been made. These decisions, however, are not persuasive here for they did not involve a claim for the recovery of an overcharge but merely an effort to prevent further violations of the Act by the issuance of an injunction which was denied in the proper exercise of the Chancellor's discretion since he found that the violations were unintentional and not likely to occur again. See Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754.

The appeal of the Administrator relates to 10 cars of lumber shipped by the mills to D. Ginsberg & Sons at Corona, New York, in January and February of 1944, as to which the judge found in favor of the defendants although the invoice exceeded the ceiling prices by the sum of $3,605.53. These cars were ordered by Ginsberg from the defendants who accepted the orders and purchased the lumber from the manufacturers f.o.b. the mills. The mills invoiced the lumber to the defendants at the correct ceiling price for the goods described but actually shipped lumber of an inferior grade. The defendants reinvoiced the lumber similarly to Ginsberg, adding the 6 per cent mark-up allowed under the regulation, and caused it to be shipped to the order of the defendants at Corona, New York, with instructions to notify their agent to turn over the cars to Ginsberg for delivery.

When the cars arrived at their destination, representatives of the Southern Pine Inspection Bureau, at the request of the Office of Price Administration, broke the seals on the cars and inspected the contents. The record is silent as to whether or not Ginsberg called for the inspection, but according to the custom and rules of the Southern Pine Association, the purchaser was entitled to an official inspection and to reject the lumber if below the grade specified in the invoice. Ginsberg informed the defendants that the cars were being inspected, and when it was found that an improper grading had been made, defendants issued new invoices on the basis of the official inspection and they were ultimately paid by Ginsberg.

It is the contention of the Administrator that the transactions between Ginsberg and the wholesaler constituted a sale at a price in excess of the ceiling price, whether they be judged by the provisions of the Emergency Price Control Act or by the general law of sales. The trial court, however, was of the opinion that in an ordinary commercial transaction of this sort the title to the goods does not pass from the shipper to the purchaser until the purchaser either accepts the goods as invoiced, thereby waiving his right to inspect, or until he accepts them after in-

spection. The court, therefore, held that neither a sale nor a delivery in excess of the ceiling price had occurred and no recovery could be had.

██ Support for this conclusion may be found in the law of sales since the goods shipped were below the quality ordered and invoiced. See 1 Williston on Sales (2d Ed.1924) § 278 at 584, 587, 588; Uniform Laws Annotated, Sales § 19(4). But we need not pass upon this question as if the ordinary law of sales were applicable. We are bound by the definition of the term "sale" as it appears in Section 302 of the Act, 50 U.S.C.A.Appendix, 942(a), which provides that the term "sale" shall include not only sales but also contracts and offers of sale. We think that even if the title to the Ginsberg cars did not pass to the buyer, nevertheless the shipment of the lumber constituted a new offer by the defendants to sell the inferior goods at the invoiced price, and that this offer constitutes a sufficient basis for the Administrator's claim to recover the overcharge. The rule is thus set out in 1 Williston on Sales (2d Ed.1924) § 279 at 587: "If goods are shipped, but because of some failure on the part of the seller to comply with the terms of the offer or contract, or with the duties imposed upon him by law, the property does not pass, the shipment constitutes an offer by the seller to the buyer; for there is a clear manifestation by the seller of willingness to allow the buyer to have the goods shipped, in satisfaction of the seller's obligation under the contract, or in performance of the order or offer previously sent by the buyer; and this cross-offer of the seller will be accepted by the buyer if he accepts the goods after an opportunity for inspecting them, or after he is, or ought to be, aware of the seller's failure to comply with the terms of the original contract or offer."

It is obvious that an offer to sell goods above the ceiling price by shipping inferior goods subject to inspection furnishes the seller the same opportunity to violate the law as a sale technically complete which occurs when the goods are sold f. o. b. the shipping point; and there is no more reason to require the buyer to prove guilty knowledge on the part of the seller in the one case than in the other. On the contrary, the same facility of evasion and the same difficulty of making proof exist in both situations.

The judgment of the District Court that the Administrator recover from the defendants the sum of $19,577.15 and costs upon the shipments first considered in this opinion is affirmed, and the case is remanded to the District Court in order that the court may enter a judgment in favor of the Administrator for the amount of the overcharge in respect to the Ginsberg cars.

Affirmed in part and remanded for further proceedings.

PARKER, Circuit Judge (dissenting in part).

I dissent from so much of the judgment of the court as finds liability on the part of the defendants for shipments made prior to March 1, 1944. Subsequent to that date, as the court below found, defendants were on notice that the mills whose product they were selling were not properly grading the lumber shipped in accordance with the invoices which were being furnished; and, in view of this notice, it was correct to hold that defendants were parties to the violation of the OPA regulations involved in the improper grading. In my opinion, however, there was shown no basis upon which defendants could be held liable with respect to the shipments made prior to March 1, as to which they had no reason to suspect improper grading and reasonably relied on the inspection certificates furnished them.

The defendants are not manufacturers but wholesale direct-mill distributors of lumber, with profits limited to 6% of the regular f.o.b. price established by the price regulations. They placed orders with the mills with which they did business, received invoices from the mills showing quantities and grades of lumber shipped, and billed their customers in accordance with these invoices, adding in the price the 6% which they were allowed. The invoices from the mills after November 15, 1943, were accompanied by inspection cer-

tificates as provided by OPA regulations and defendants relied upon these as being correct. At no time prior to March 1, 1944, did they have reason to suspect that the quantities and grades did not correspond to the billing thereof. The District Judge found as to this: "That with respect to the items enumerated in the preceding findings of fact, the court finds that the violations of the regulation by the shippers on or before March 1, 1944, occurred without the defendant in this case willfully participating therein or failure on the part of defendant to take practical precautions against the violation. * * * There is some uncertainty in the evidence as to when the defendants received actual knowledge of the results of all these inspections, and for this reason and in order to give the defendant the benefit of every reasonable inference, the court fixes March 1, 1944, as the date when this knowledge came to the defendant, and the court likewise finds that from that time on it was the duty of the defendant to take practical precautions against future violations of these regulations by these particular shippers."

In the contracts which defendants made with purchasers, there was no charging of an excessive price. The excessive price resulted from violation of the regulations with respect to the grading of the lumber; but this was the shipper's fault, to which defendants were not parties and which prior to March 1, they had no reason to suspect. It is clear that a violation of the act can arise from delivery of goods of an inferior quality as well as from the express charging of an excessive price, East v. Bowles, 5 Cir. 158 F.2d 227; but to subject one to a penalty for such delivery, he should in some way participate in or have knowledge of the breach of regulation which it involves. It will not do to say that the wholesaler is liable merely because he has made the sale, and is liable upon his implied warranty, or that he can be held liable for correction of the mistake. This liability exists in any event and can be asserted by the purchaser at any time within the period of the state three year statute of limitations. The question is whether the statutory liability is incurred in addition. I do not think it is incurred where the wholesaler bills out the lumber in good faith and at a proper price on the invoices furnished him, and violation of the regulation occurs entirely without his fault or knowledge as a result of conduct on the part of others over whom he has no control.

I agree that the act ought not to be interpreted in such way as to permit evasions; and a seller in position of the defendants here might well be required to bear the burden of showing lack of knowledge; but the defendants have carried this burden and have an affirmative finding of the court below upon which to rely. There is a manifest difference between a seller who makes delivery through his own organization and who should be charged with knowledge of what is done by his agents and servants, and one, like the defendants here, who is little more than a sales agent and who depends upon an independent organization for making delivery under his contracts. To penalize one in the latter position for violation of regulations by those over whom he has no control, when he does not participate in or have knowledge of such violations is not required by anything contained in the statute or in any of the regulations adopted thereunder. No case has been cited to us where a broker or wholesaler, relying on invoices or certificates, has been held liable for excessive prices, arising without his knowledge from violation of the act by the party from whom he has purchased; and I know of none, and am opposed to establishing a precedent to that effect. The law ought not be interpreted in such way as to penalize the innocent who have conducted business in good faith according to accepted standards.

To hold that the broker or wholesaler is not liable under such circumstances does not, of course, exonerate the shipper upon whom responsibility for violation of the regulations rests; and it is worthy of note that suits have been instituted against the shippers who filled the orders of defendants here to recover damages on account of the very transactions that are involved in this suit. There is no objection to granting

recovery against the wholesaler as well as the shipper, where the former has participated in the violation of regulations of which the latter has been guilty; but this should not be done where the shipper has violated the regulations without participation or knowledge on the part of the wholesaler. This case well illustrates the hardship that may otherwise result to the innocent. Defendants are being held in damages in the sum of more than $13,000 in connection with transactions had before March 1, 1944, which were carried on in entire good faith, and upon which their total profits amounted to less than $3,000. I do not think it could have been intended that this sort of penalty should be visited on a dealer who in good faith made a legitimate contract expecting it to be carried out as made, merely because, without his knowledge, a third person over whom he had no control violated OPA regulations.

There is yet another ground upon which recovery on account of the shipments to Ginsberg should be denied. Not only was there no intent on the part of defendants to charge an excessive price, but, as pointed out by the court below, there was no delivery and consequently no sale. In other words, in the Ginsberg transaction delivery of an inferior grade under a contract calling for a higher grade cannot be relied upon as a violation of the regulation, for the reason that the delivery was not made.

I do not think, that, because the shipper attempted such delivery, defendants can be said to have made an offer in violation of the regulations. Defendants contracted to sell lumber of a certain grade and expected lumber of that grade to be shipped by the mill. They knew nothing about the mill's shipping an inferior grade and cannot reasonably be said to have offered the inferior lumber at the price of the higher grade. The fact of the shipment of inferior lumber by the mill, of which the defendants knew nothing, cannot fairly be tacked on to the price provision of the legal contract which defendants had made so as to put them in the position of offering to sell inferior lumber at the contract price. Furthermore, the lumber was not shipped to Ginsberg at all but to defendants, and its inferior quality was discovered before it was tendered to Ginsberg; and, when it was subsequently tendered to him, this was upon a rebilling at a proper price. I am unable to see any principle upon which an offer of the lumber to Ginsberg at an illegal price can possibly be spelled out of the legal contract made by defendants and the shipment of inferior lumber by the mill to defendants to be tendered on the contract, where, in fact, it was never tendered on the original contract, but only on a new billing and at the proper price.

I concede that, if defendants had offered to deliver to Ginsberg inferior lumber on a contract calling for a higher grade, it might be said that they were offering to sell low grade lumber at high grade prices. But defendants did not do this. The shipment of low grade lumber was made without defendants' knowledge or consent and it was made, not to Ginsberg, but to defendants. It would be straining the law of contracts beyond the breaking point, to hold that such shipment by the mill of inferior lumber may be held a new offer by defendants to sell that lumber at the contract price.

No one, I think, would contend that the penalty was incurred, where a different grade of lumber was shipped to a purchaser through bona fide mistake of fact, when the mistake was discovered and corrected before payment was received; and I see no difference between that case and this, where a wholesaler bills out lumber in good faith on the invoices furnished him, where the furnishing of inferior lumber was entirely the fault of others without his knowledge or participation, and where the facts were discovered by the wholesaler and correction made by him before payment was made by the purchaser.