**Walt SCHINKAL, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 14313.**

United States Court of Appeals Ninth Circuit.

Sept. 20, 1955.

H. Pitts Mack, San Diego, Cal., Harrison W. Call, Sacramento, Cal., for appellant.

Warren E. Burger, Asst. Atty. Gen., Samuel D. Slade, Richard M. Markus, Attys., Department of Justice, Washington. D. C., Laughlin E. Waters, U. S. Atty., Max F. Deutz, Los Angeles, Cal., Harry D. Steward, San Diego, Cal., Marvin Zinman, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and CHAMBERS, Circuit Judges, and WIIG, District Judge.

CHAMBERS, Circuit Judge.

Schinkal's business is "juke boxes." He has operated them in San Diego County, California, for some years. From individual restaurants mainly, he obtains concessions and installs his coin-operated machines. They are placed on a basis of Schinkal and the "house" dividing the money paid into the machines by customers who come to the proprietor's place for food or drink and then somehow find life more worthwhile if they accompany it with the music or noises emitted from Schinkal's machines at his price.

June 27, 1950, was the date upon which the United States became involved in the Korean "conflict." On September 8, 1950, the Defense Production Act, Public Law 774, 64 Stats. at Large 798, 50 U.S. C.A.Appendix, § 2061 et seq., became effective.[1] This act sought in many ways to control the economy of the country, as was deemed necessary in a situation that had most of the aspects of war except its name. Among the major divisions of the act was one (Title IV) to revive price controls, so familiar in World War II, and the rough equivalent of the old Office of Price Administration to be called by a new name. Price control was authorized to be established administratively by regulations of the new independent agency the President called the Office of Price Stabilization, hereafter O.P.S.

Generally, price controls were not precipitately invoked. The first regulations of O.P.S. which anyone argues affected Schinkal's business were contained in a price control order, wide in compass, called General Ceiling Price Regulation, dated January 26, 1951, and published January 30, 1951, in the Federal Register, 16 Fed.Reg. 808, 32A C.R.F. 1451.

Inherent in all price regulations is the selection of a base period for a standard or yardstick. The General Ceiling Price Regulation chose as a base for prices the period December 19, 1950, to January 25, 1951. Subject to qualification, the highest price a seller used during that period was his ceiling price.

Schinkal's product must be classified in order to apply the regulations. This court is of the opinion that the parties are correct in classifying it as a "service."

After the general regulations came refinements. O.P.S. published, on May 12, 1951, Ceiling Price Regulation No. 34, 16 F.R. 4447, 32A C.P.R. 732. Generally, this regulation C.P.R. 34 removed services from the General Ceiling Price Regulation of January 26, 1951, and was designed to be self-sufficient, regulation-wise, to control prices of services. Again this regulation chose the same base period of December 19, 1950, to January 25, 1951, as was used in the January regulation.

Generally, during the base period the Schinkal machines were equipped to sell the playing of one record for five cents. Schinkal had about 90 establishments where his so-called "services" were sold through coin-operated vending machines. In the base period Schinkal had at least one machine which he had converted to play the records at ten cents, three for a quarter. He may have had nine or ten. The number is in dispute. It appears that by December, 1950, he was beginning gradually to change the machines over from a nickel to the higher price. After the publishing of the General Ceiling Price Regulation on January 30,

---

1. In scheme, the act was largely standby legislation to be invoked by the President when he found the provisions were needed. The act generally became effective as a result of a series of executive orders.

1951, Schinkal continued to make mechanical adjustments on the machines, first one place and then another.

Eventually, about one-half of the locations had been converted to ten cents, three for a quarter. Then the O.P.S. agents started after Schinkal. He was, they said, violating the price control regulations. Under the pressure of the agents he started reconverting establishments back to five cents per play. Reestablishment of the status quo was undoubtedly hindered by a shortage of necessary metal parts. But he did make some progress.

■ In September, 1952, the full majesty of the sovereignty of the United States came down upon Schinkal. The United States sued him for overcharges made to juke box customers on his ten cents, three for a quarter machines during the twelve months preceding September 24, 1952. (The action did not attack the machines converted prior to January 25, 1951.) It will be observed that the period for which recovery of the overcharge was sought was all subsequent to the publication of Ceiling Price Regulation 34 on May 12, 1951. Of course, no juke box customer had taken the overcharge, minimal as to himself, to court. So the government sought "treble damages" and an injunction. No injunction ever issued and the issue of "treble damages" came on for trial in November, 1953, after prices had been decontrolled. Under the statute, if Schinkal was "guilty" the government was still entitled to the damages even though price control was no longer being imposed. Sec. 706, Defense Production Act and Sec. 109(e), Public Law 96, ch. 275, 65 Stat. 139, 50 U.S.C.A.Appendix, § 2156.

At the trial there was a jury. To it, interrogatories were submitted under instructions of the court. By its verdict the jury said that Schinkal made charges on his juke boxes in excess of allowable ceiling prices to the extent of $11,082.99 during the twelve months at issue. Further, it said the overcharges were wilful and also were due to Schinkal's failure to take practicable precautions. The gov-

ernment demanded "treble damages," but the trial court limited the judgment to the amount of the overcharge found by the jury, to wit: $11,082.99.

Defendant has appealed. He has three points:

1. He contends the basic statute, the Defense Production Act, and the regulations exempted him. He says he came under the exemption on "materials furnished for publication by any press association or feature service". Sec. 402(e) (iii), Defense Production Act of 1950 and regulations adopted pursuant thereto.

2. He contends, assuming the regulations were applicable to him, that his prices did not violate the regulations.

3. He contends for a sort of "immunity." He was forced to furnish documentary evidence against himself and to testify at the trial in spite of his firm objection to testifying.

■ As to point (1), we find that the appellant makes a very fine argument, but we reject it, believing that the exemption in the act for "materials used for publication by any press association or feature service" was designed to protect sources of public information against control rather than Schinkal's publications, if such they be.

■ As to point (2), as we read the General Ceiling Price Regulation of January 30, 1951, in its entirety, it is our belief that Schinkal's price increases made at the various establishments between January 30 and May 12, 1951, were perfectly permissible under that overall regulation. We think it was at his option under the first regulation, called G.C.P.R., to treat all of his outlets as one business for the purpose of pricing and to raise any or all prices to the highest price charged by him anywhere in San Diego County in the base period December 19, 1950, to January 25, 1951. We think this was permitted under Sections 3, 5 and 12 of the General Ceiling Price Regulation. We are not impressed with arguments designed to destroy this privilege which assert that the nickel lo-

cations were in a different "class" than the dime locations.[2] Classification under the regulations depends on classifying the purchasers of Schinkal's mechanical music, not the establishments where they were located. We think in the absence of some showing by the government (which would seem impractical) it must be taken that all persons who patronize juke boxes are of the same class.

If any of the recovery herein were based on the period prior to May 12, 1951, when Ceiling Price Regulation 34 was adopted, we would reverse the case.

However, it is our interpretation that C.P.R. 34, taken as a whole, destroyed Schinkal's previous right under the general January regulation to use for all locations the highest price he had had at any location in the base period. In other words, by the May regulation specially directed at services, his business then came under that regulation. In our judgment, as to him it superseded the January regulation. In both regulations, each of his places of business was a separate seller subject to a ceiling price at each location. But in the January regulation, at his option Schinkal could treat them as one seller. (We think under Section 12 his prices were centrally determined.) True, this was a privilege the Office of Price Stabilization could take away from him. It never did. But under the May regulation, the option of combining separate selling stations into one unit before determining a ceiling price required permission of the Office of Price Stabilization.[3] This Schinkal never obtained.

It is significant that the government never bothered Schinkal until after the adoption of the May regulation on services. This may have been due to a lack of staff or it may have been that O.P.S. gave the same interpretation to the January regulation as this court does: that Schinkal was not violating it.

While the trial court under its judgment gave Schinkal about all of the consideration it could in limiting the government's recovery to the amount of the actual overcharge, yet we realize that Schinkal has plausible ground for complaint against the law as in practice it was applied against him. Here he has divided his "overcharge" 50–50 with his customer-establishments. If we are right that his increases were permissible under the first regulation, then the later regulation came at a time when material was difficult to get to reconvert his juke boxes back to nickel play. At that point, he had a choice of at least partially going out of business (which might have posed serious problems for him with his establishments) or getting entangled with the majesty of his government. He did slowly reconvert to a nickel at many of his establishments. Whether this slowness was due to a shortage of materials or a dogged hope that he could get some relief administratively, we do not know.

The fairness or validity of O.P.S. regulations was not entrusted to this court under the Defense Production Act. Schinkal has been to the Emergency Court of Appeals with some issue relevant to the facts here and has lost.

In a system of price control not based on an absolute freezing of prices and wages (and the price controls of World War II and of the Act of 1950 were both designed for "flexibility") we suppose

---

2. Section 22, G.C.P.R., had the following definition:

    *       *       *       *       *

"Class of purchaser or purchaser of same class. This terms refers to the practice adopted by a seller in setting different prices for sales to different purchasers or kinds of purchasers (for example, manufacturer, wholesaler, shopper, retailer, Government agency, public institutions or individual consumer) or for purchasers located in different areas or for purchasers of different quantities or grades or under different terms or conditions of sale or delivery."

    *       *       *       *       *

3. See Section 10, C.P.R. 34.

The equivalent of Section 12, G.C.P.R., is not to be found in C.P.R. 34. This court is unable to fit Schinkal's pattern of conduct into the concessions of Section 12, C.P.R. 34, which generally covered uncompleted but announced (during the base period) price increases.

there will be many seeming inequalities which are a sacrifice to the larger cause of trying to stop runaway inflation.

 As to point (3), that Schinkal reached a haven of safety when he furnished evidence in response to a subpoena or when he testified in this case in the trial court as a government witness, appellant makes a very convincing argument. But in our judgment he is concluded by our decision in Kessler v. Fleming, 9 Cir., 163 F.2d 464. Appellant says Kessler merely holds that the "form" of the government's action here is civil; that Kessler did not hold the "nature" of the action is civil, i. e., non-penal in form. As we read Kessler the rationale of the case is that recovery by the government of the amount of the overcharge, sometimes even treble, is not to be considered penal and consequently a penalty. True, the Kessler decision might have stood on just the grounds appellant insists it stands upon, i. e., that Kessler holds the action for the overcharge is civil in "form." [4] Under all the circumstances, this court as constituted for Schinkal's case believes itself bound to follow what was said in the Kessler case.[5] To do otherwise would be tacitly to overrule Kessler. Therefore,

we hold Schinkal did not achieve exemption from the government claim for the overcharge when he testified unwillingly in the case or when he supplied his records to the government in response to a subpoena prior to the trial.

The judgment is affirmed.

---

4. The appellant makes some criticism of Crary v. Porter, 8 Cir., 157 F.2d 410, cited with approval in the Kessler case, which criticism may be justified.

5. In the Kessler case, 163 F.2d 464, at page 468, this court said:

"Appellants argue, however, that the action, being for treble damages, is in its nature penal and quasi-criminal, and that accordingly the Federal Rules of Civil Procedure [28 U.S.C.A.] are not controlling. The state law, it is said governs; and it is insisted that under Washington law the date of completion of service of process, rather than the date of filing the suit, marks the time of commencement. We think otherwise. The treble damage sanction of the Emergency Price Control Act [50 U.S.C.A.Appendix, § 901 et seq.] may in a sense be considered a penalty, but this fact does not necessarily serve to change the nature of the remedy provided. It is reasonably clear that Congress imposed the sanction as a measure of civil redress. As observed in

Crary v. Porter, 8 Cir., 157 F.2d 410, 414, increased or multiple damages are not authorized to be assessed under § 205 (e) of the Act as a substitute for criminal punishment. Criminal sanctions for violations are separately provided for in § 205(b). Cf. Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917. Mutliple or exemplary damages whose allowance depends upon the recovery of actual damages, have never, so far as we are aware been regarded as amounting to a criminal penalty. The view that the treble damage sanction is remedial rather than punitive has been taken in other cases aside from Crary v. Porter, supra. See Amato v. Porter, 10 Cir., 157 F.2d 719. Cf. Culver v. Bell & Loffland, 9 Cir., 146 F.2d 29, dealing with the cognate provision of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The decision in Bowles v. Farmers Nat. Bank, 6 Cir., 147 F.2d 425, is in part contra, but the case recognizes that the action provided is a civil one."