Mr. Justice STRONG
delivered the opinion of the court.
The first error assigned is that a civil action of debt will not lie, at the suit of the United States, to recover the for *542 feitures or penalties incurred under this act of Congress, and that the court below erred in holding that such an action might be maintained. It is not contended that an action of debt will not lie to recover duties, if the defendant be the owner or importer of the goods imported, for it is conceded that by the act of importing an obligation to pay the duties is incurred. The obligation springs out of the statutes which impose duties. ' Nor is it doubted that when a statute gives to a private person a right to recover a penalty for a violation of law he may maintain an action of debt, but it is insisted that when the government proceeds for a penalty based on an offence against law, it must be by indictment or by information. No authority has been adduced in support of this position, and it is believed that none exists. It cannot be that whether an action of debt is maintainable or not depends upon the question who is the plaintiff*. Debt lies whenever a sum certain.is due to the plaintiff, or a sum which can readily be reduced to a certainty—a sum requiring no future valuation to settle its amount. It is not necessarily founded upon contract. It is immaterial in what manner the obligation was incurred, or by what it is evidenced, if the sum owing is capable of being definitely ascertained. The act of 1823 fixes the amount of the liability at double the value of the goods received, concealed, or purchased, and the only party injured by the illegal acts, which subject the perpetrators to the. liability, is the United States. It would seem, therefore, that whether the liability incurred is to be regarded as a penalty, or as liquidated damages for an injury done to the United States, it is a debt, and as such it must be recoverable in a civil action.
But all doubts respecting the matter are set at rest by the fourth section of the act, which enacted that all penalties aud forfeitures incurred by force thereof shall be sued for, recovered, distributed, and accounted for in the manner prescribed by the act of March 2d, 1799, entitled “An act to regulate the collection of duties on imports and tonnage.” By referring to the 89th section of that act it will be seen that it directs all penalties, accruing by any breach of the *543 act, to be sued for and recovered, with costs of suit, in the name of the United States of America, in any court competent to try the same; and the collector, within whose district a forfeiture shall have been incurred, is enjoined to cause suits for the same to be commenced without delay. This manifestly contemplates civil actions, as does the proviso to the same section, which declares that no action or prosecution shall be maintained in any case under the act, unless the same shall have been commenced within three years after the penalty or forfeiture was incurred. Accordingly, it has frequently been ruled that debt will lie, at the suit of the United States, to recover the penalties and forfeitures imposed by statutes.* It is true that the statute of 1823 imposes the Forfeiture and liability to pay double the value of the goods received, concealed, or purchased, with knowledge that they had been illegally imported, “on conviction thereof.” It may be, therefore, that an indictment or information might be sustained. But the question now is, whether a civil action can be brought, and, in view of the provision that all penalties and forfeitures incurred by force of the act shall “be sued for and recovered,” as prescribed by the act of 1799, we are of opinion that debt is maintainable. The expression “sued for and recovered ” is primarily applicable to civil actions, and not to those of a criminal nature.
The second assignment of error is that the jury were instructed the knowledge of the defendants required by the statute in order to render them liable, was conclusively presumed from the knowledge of their agent, their partner in the transaction. This is hardly a fair exhibition of what the court did charge. The instruction' given to the jury, and all that is assigned for error, wras that “ if Leman Stockwell, as a member of the firm, engaged in the shingle business at the time of the importation and reception of the shingles at *544 Bangor, knew that they were Province shingles, liable to duty and seizure, and illegally imported, it was not necessary for the government to prove that the defendants personally had actual knowledge of these facts, which were then within the knowledge of their partner, Leman Stock-well.” This is all which is embraced in the assignment. But the court added, that “if with this knowledge, as before stated on Leman’s part, that the shingles were illegally imported and liable to seizure, D. R. Stockwell & Co., in the usual course of the business, received the shingles at Bangor, and they were disposed of by them, and the profits of the business divided as stated above, the jury were authorized to find that the defendants, being Leman’s partners, received the shingles knowing the same were illegally imported and liable to seizure.” Taking this together, and it must be so taken, for the exception was general to the instructions given, it cannot be said to justify the complaint that the court ruled knowledge of the defendants that the shingles had been illegally imported was conclusively presumed from the knowledge of Leman Stockwell, their partner. Qualified by what was added to the language alleged to be erroneous, it amounts to no more than that the jury might presume such knowledge from the facts stated.
To understand the force and merits of this instruction it is necessary to notice concisely the facts of which evidence had been given at the trial.
The defendants were lumber dealers resident in Bangor, in the State of Maine, and partners under the firm name of D. R. Stockwell & Co. In 1863 they made an arrangement with Leman Stockwell, a brother of one of the partners, that he should go to Aroostook County, in Maine, and to Frederickton and St. John, in the Province of New Brunswick, and there collect, buy, and forward shingles, consigned to the firm at Bangor. By the arrangement he became a partner with them in the shingle business, done in pursuance of it. He purchased shingles and shipped them from St. John to Bangor, consigned to the firm. Some of these shingles were of Provincial growth, known to Leman Stock- *545 well to be such. They were of course subject to duties. There was evidence that Leman Stockwell knew them to be subject to duties, and liable to seizure if the duties were not paid, and that with that know!edge he exported them from St. John, documented as of the growth of Maine, with the intent that they should be, and in order that they might be, imported as free from duty. "When the cargoes came to Bangor, in 1868 or 1864, the defendants reported them at the custom-house with the manifest and foreign clearances, and with certificates, or affidavits, of their American origin. No duties were therefore exacted, nor were entries required to be made, or invoices, or bills of lading to be produced; but the collector allowed the shingles to be taken to the sheds of the defendants, where they were received, sorted, and sold in the usual manner of the trade. An account was kept of the business, and at the end of each year the profits were divided between Leman Stockwell and the members of the firm. When subsequently it was discovered, after all the shingles had been sold, that they were not of American origin, but were the growth of the Province of New Brunswick, and as such subject to duties, and consequent!}’ that they had been illegally imported, in fraud of the revenue laws, this action was brought, and at the trial the defendants requested the court to charge the jury “that they must be satisfied, as to each defendant, that he knew that the shingles had been illegally imported, and were liable to seizure, before he received, concealed, or bought the same; and that such receiving, concealing, or buying must have been with an intent to defraud the revenues.” The court, however, instructed the jury, as we have above stated. It is now insisted that in thus charging the jury the court fell into error. The argument is rested mainly upon the assumption that the statute upon which the action is founded is a penal statute intended solely for the punishment of crimes against the revenue laws. It is not seriously denied that in civil transactions a principal or a partnership is affected by the knowledge of the agent or copartner, and that the knowledge of the agent is in law attributed to his principal, as *546 well as that of the partner to all the members of the firm; nor is it much insisted that a principal, or copartner, is not liable for the tort of an agent, or copartner, done without his knowledge or authority, in suits brought by third persons to recover compensation, or indemnity for loss sustained in consequence of the tort; but it is argued that the rule does not apply in the case of suits for a penalty. It becomes, then, material to consider the nature and purposes of the statute under which it is claimed the liability of the defendants has arisen. Is it strictly punitive, or is it remedial ?
When foreign merchandise, subject to duties, is imported into the country, the act of importation imposes upon the importer the obligation to pay the legal charges. Besides this the goods themselves, if the duties be not paid, are subject to seizure and appropriation by the government. In a very important sense they become the property of the government. Every act, therefore, which interferes with the right of the government to seize and appropriate the property which has been forfeited to it, or which may hinder the exercise of its right to seize and appropriate such property, is a wrong to property rights, and is a fit subject for indemnity. Now, it is against interference with the right of the government to seize and appropriate to its own use property illegally imported that the statute of 1828 was aimed. It was to secure indemnity for a wrong to rights of property. The instant that goods are illegally imported, the instant that they pass through the custom-house without the payment of duties, the right of the government to seize and appropriate them becomes perfect. If any person receives them, knowing them to have been illegally imported, or conceals them, or buys them, his act necessarily embarrasses, if it does not defeat altogether the possibility of the government’s availing itself of its right and securing the property. It is therefore manifest that the act of 1823 was fully as remedial in its character, designed as plainly to secure civil rights, as are the statutes rendering importers liable to duties. Its plain purpose was to protect the government in the unembarrassed enjoyment of its rights to all goods and *547 merchandise illegally imported, and it proportioned indemnity for infringement upon such rights to the loss which such infringement might cause. The amount recoverable is in proportion to the value of the goods abstracted or concealed, or bought, not at all in proportion to the degree of criminality of the act of receipt or concealment. Obviously there may be more guilt in concealing goods illegally imported, worth only one hundred dollars, than in receiving or concealing imported property worth ten times as much, but the statute measures the liability not by the guilt but by the valué of the goods. It must therefore be considered as remedial, as providing indemnity for loss. And it is not the less so because the liability of the wrongdoer is measured by double the value of the goods received, concealed, or purchased, instead of their single value. The act of abstracting goods illegally imported, receiving, concealing, or buying them, interposes difficulties in the way of a government seizure, and impairs, therefore, the value of the government right. It is, then, hardly accurate to say that the only loss the government can sustain from concealing the goods liable to seizure is their single value, or to assert that the liability imposed by the statute of double the value is arbitrary and without reference to indemnification. Double the value may not be more than complete indemnity. There are many cases in which a party injured is allowed to recover in a civil action double or treble damages. Suits for infringement of patents are instances, and in some States a plaintiff* recovers double damages for cutting timber upon his land. It will hardly be claimed that these are penal actions requiring the application of different rules of evidence from those that prevail in other actions for indemnity. Regarding, then, an action of debt founded upon the act of 1823 as a claim for compensation or indemnity, it cannot be maintained upon authority or principle that the knowledge of the agent that the goods had been illegally imported is not presumptively the knowledge of the principal. That as a general rule partners are all liable to make indemnity for the tort of one of their number, committed by him in the course of the part *548 nership business, is familiar doctrine. It rests upon the theory that the contract of partnership constitutes all its members agents for each other, and that when a loss must fall upon one of two innocent persons he must bear it who has been the occasion of the loss or has enabled a third person to cause it. In other words, the tortious act of the agent is the act of his principals, if done in the course of his agency, though not directly authorized. And this is emphatically true when the principals, as in this case, have received and appropriated the benefit of the act. These defendants received the shingles on their arrival at Bangor, presenting at the custom-house false certificates of their American origin. They paid no duties. They removed the property to their own lumber sheds, sold it, and divided the profits, retaining a portion for themselves. They have therefore now the proceeds of sale of property which was not their own, but which had been forfeited to the United States, and they have secured and they now hold these proceeds through the tortious act of their own partner, who planned and effected the fraudulent importation for their benefit and his. Can it be that they may derive a profit from his fraud and yet repudiate his act by asserting that his knowledge of the fraud does not affect them ? If they can, the revenue laws will be found utterly ineffectual to protect the revenues of the government, and facilities to fraud will be abundant. If an irresponsible agent consigns to his principal foreign merchandise, documenting it as of American growth or production, it will always be difficult if not impossible to prove knowledge by the principal that the agent has perpetrated a fraud, and if that is necessary to give to the government a right of action under the act of 1828 against the principals who claim or conceal property thus brought into the country, the act utterly fails to secure a remedy for the mischief against which it was intended to guard.
The plaintiffs in error have argued that in all cases where knowledge is by statute made essential to liability, whenever an attempt is made to hold a principal or partner responsible *549 for a loss occasioned by the act of bis agent, or partner, the question of his knowledge, apart from that of the agent, is submitted to the jury, or, in other words, the knowledge of the agent or partner is regarded as distinct from that of the principal. Numerous eases have been cited which it is supposed support this position. We do not find, however, that such is the doctrine of any of them. The case of Regina v. Dean, one of the cases cited, was an information for penalties under the Smuggling Prevention Act of 3 and 4 Will. IV, in which the defendant was charged, inter alia, with knowingly harboring goods imported and illegally unshipped without payment of duties. At the trial it appealed that a clerk of the defendant, with the assistance of two custom-house officers, had made false entries of the quantities of goods imported, but no knowledge of the fraud was brought home to the defendant, though it appeared that he had, or must have derived benefit from the fraudulent transaction. Lord Abinger told the jury that as the defendant had derived benefit from the fraud, they might infer knowledge on his part of the fraud having been committed, and that the case, under those circumstances, would be made out against the defendant. This was very like the instruction given, o'f which the plaintiffs in error complain. Ou a motion for a new trial, for misinstruetion, the Exchequer refused a rule. It was conceded in the argument that when goods illegally imported, without payment of duties, are brought to the place of business of a trader, by an agent or clerk of his, known by him not to have paid any duty, and are found there, there is a fair inference he knew the duties had been evaded. The ruling in this case was in a criminal proceeding. The information was for a penalty, and not for the value of the goods. Graham v. Pocock is another case cited. There the defendants were sued, and one of them was held liable for unshipping and landing goods liable to forfeiture. No question of knowledge was mooted. And in none of the other cases cited do we find it held that in civil actions for indemnity, or for double or treble value, the knowledge of the agent is not to be imputed to the principal. Upon this *550 subject the opinion of this court has been outspoken, and it has been in accordance with the instruction given to the jury in the case before us.* The principle asserted in all those cases is that whatever an agent does, or says, in reference to the business in which he is at the time employed, and withiu the scope of his authority, is done, or said, by the principal; and may be proved, as well in a criminal as a civil case, in like manner as if the evidence applied personally to the principal.
The British statutes for the prevention of smuggling differ from our act of 1828. They are both penal and remedial. They impose not only a liability for treble value of goods illegally imported, upon assisting in unlading them, or knowingly harboring or concealing them, but also a stipulated penalty, in some eases leaving to the revenue commissioners to determine whether proceedings shall be instituted for the penalty or for treble the damages. Yet in both classes of cases the fraudulent act of a servant is held attributable to his master wheu the master has derived a benefit from the illegal importation.† We think, therefore, the charge of the court, of which the plaintiffs in error complain, was not erroneous.
It is next contended that section second of the act of 1823 cannot be construed to apply to the illegal importers themselves. As it extends only to acts done after the illegal importation and requires knowledge of its illegality, it is argued that it aims rather at accessories after the fact. We think, however, it embraces both. If it does not, then greater liabilities are laid bn the accessory than on the principal. .The mischief at which the act aimed was, as we have seen, embarrassing the right of the government to seize the forfeited goods. That may be done as well by importers as *551 others. They may receive the goods or conceal them, and the wrong to the government is precisely the same, whether the concealment is by them or by others who were not the importers. It certainly would be most strange if the accessory to a wrongful act were held responsible therefor when the principal goes free. As was said in Graham v. Pocock, the question who is liable for receiving, concealing, or buying the shingles is a question to be determined irrespective of the inquiry who is the principal and who the accessory.
Finally, it is argued that the act of 1823 (section 2) was repealed by the act of July 18th, 1866, entitled “An act further to prevent smuggling, and for other purposes,” the 4th section of which enacted “ that if any person shall fraudulently or knowingly import or bring into the United States any goods, wares, or merchandise contrary to law, or shall receive, conceal, buy, sell, or in any manner facilitate the transportation or concealment or sale of such goods, wares, or merchandise after their importation, knowing the same to have been imported contrary to law, such goods, wares, and merchandise shall be forfeited, and he or she shall, on conviction thereof before any court of competent jurisdiction, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both, at the discretion of such court.” The 43d section of that act enacted that al' other acts and parts of acts conflicting with or supplied by it should be repealed. It is now insisted that the act of 1823 was in conflict with this act, or, if not, that it was supplied by it. Very clearly, however, this is not maintainable. The act of 1823 was, as we have seen, remedial in its nature. Its purpose was to secure full compensation for interference with the rights of the United States. The act of 1866 is strictly penal, not at all remedial. It was avowodly enacted further to prevent smuggling. Its design, therefore, was not to substitute new penalties which might be less onerous than the liabilities which former acts had imposed, but to punish as a crime that which before had subjected its perpe *552 trator to civil liability, or quasi civil liability. Hence it is cumulative in its character rather than substitutionary. If it has indeed only supplied what was enacted in 1823, then a party who conceals goods illegally imported and forfeited to the United States is subject to no more than a fine of five thousand dollars, with possible imprisonment, though the goods concealed and thereby wholly lost to the government may be worth one hundred thousand dollars, and this, though the declared purpose of the act was more effectually to prevent smuggling. This cannot be. There is no inconsistency between a remedy for an illegal act which works a private wrong, securing pecuniary compensation, and a statute making the same act a criminal offence and punishing it accordingly. Were there nothing more, then, in the act of 1866 than the 4th and the 43d sections, we should feel compelled to hold that the 2d section of the act of 1823 was not repealed by it. But the 18th section expressly enacted that nothing in the act shall be taken to abridge or limit any forfeiture, penalty, fine, liability, or remedy provided for or existing under any law then in force, except as in the act was specially provided. Certainly the act contains no special provision for the civil remedy given by the act of 1823. It merely imposes punishment and superadds criminality to that which before was a civil injury. It is said the court will not construe the statutes so as to give the executive department the option to treat two citizens who have done the same act affecting the same cargo in such manner that one statute may be applied to one, and a different statute to another, thus causing different consequences. But the true question is whether a wrongdoer may not be both civilly and criminally responsible for the same act, and it would not be strange if Congress had given the option to sue for double values, or to prosecute for the crime. The British statutes against smuggling, as we have stated, allow suits for treble value of goods illegally imported and harbored, or prosecutions for penalties, at the election of the government. Our opinion, then, is that the 2d section of the act of 1823 was not repealed by the act of 1866, *553 certainly not so as to affect this suit, brought to enforce liabilities incurred before the later act was passed.
Judgment affirmed.

 United States v. Colt, Peters’s Circuit Court, 145; Jacob v. United States, 1 Brookenbrough, 520; United States v. Bougher, 6 McLean, 277; Walsh v. United States, 3 Woodbury & Minot, 342; United States v. Lyman, 1 Mason, 482; United States v. Allen, 4 Day, 474.

 Vide United States v. Gooding, 12 Wheaton, 468; American Fur Company v. United States, 2 Peters, 364; and Cliquot’s Champagne, 3 Wallace, 140.

 Attorney-General v. Siddon, 1 Crompton & Jervis, 220; Rex v. Manning, 2 Comyns, 616.