425 S.E.2d 177

STATE of West Virginia ex rel. Mario
J. PALUMBO, Attorney General,
Plaintiff Below, Appellant,

v.

GRALEY'S BODY SHOP, INC., an Ohio
Corporation; Geer Brothers Body
Shop, Inc., a West Virginia Corpora-
tion; Keaton's Body Shop, Inc., a West
Virginia Corporation; Huntington
Chrysler–Plymouth, Inc., a West Virgi-
nia Corporation; Galigher Ford, Inc., a
West Virginia Corporation; Olen L.
Doddridge, dba East End Body Shop;
Jimmie Graley; Donald R. Graley;
David Lynn Geer; Royce Dale Geer;
Rick L. Keaton; Frank Horney; Jacob
C. Rardin, IV; and other persons whose
names and identities are not yet known
to the plaintiff, Defendants Below, Ap-
pellees.

No. 21301.

Supreme Court of Appeals
of West Virginia.

Submitted Oct. 6, 1992.

Decided Dec. 14, 1992.

Mario J. Palumbo, Donald Darling, Donna S. Quesenberry, Office of the Atty. Gen., Charleston, for appellant.

David Lockwood, Lockwood, Egnor, Gardner & Cyrus, Huntington, for Graley's Body Shop, Inc., appellee.

William D. Levine, St. Clair & Levine, Huntington, for Geer Brothers Body Shop, Inc., appellee.

Lafe Chafin, Barrett, Chafin & Lowery, Huntington, for Keaton's Body Shop, Inc., appellee.

Helen M. Morris, Baer, Colburn & Morris, Huntington, for Huntington Chrysler–Plymouth, Inc., appellee.

James Allan Colburn, Baer, Colburn & Morris, Huntington, for Olen L. Doddridge, appellee.

Fred B. Westfall, Jr., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for Galigher Ford, Inc., appellee.

McHUGH, Chief Justice:

The Attorney General, Mario J. Palumbo, on behalf of the State of West Virginia, seeks review of an order of the Circuit Court of Cabell County which dismissed, with prejudice, a complaint filed by the Attorney General against the appellees, Graley's Body Shop, Inc., et al., alleging that they violated the West Virginia Antitrust Act (Antitrust Act), *W. Va. Code*, 47–18–1 to 47–18–23, as amended, by participating in a price-fixing scheme. Upon review of the case before us, we conclude that the order of the circuit court should be reversed.

I

The Attorney General represents that, in early 1991, he received information that certain auto body repair shops in the Huntington, West Virginia area were engaged in price-fixing activities. After evaluating this information, the Attorney General concluded that there was probable cause to believe that the Antitrust Act had been violated, and initiated an investigation un-

der the provisions of *W.Va.Code*, 47–18–6 [1978] and 47–18–7 [1978].

Pursuant to the investigation, the Attorney General caused subpoenas containing requests for production of documents and written interrogatories, and subpoenas for oral testimony to be issued to the appellees. After taking the statements of the individual appellees and reviewing the results of the investigation, the Attorney General filed a complaint against the appellees alleging price-fixing, refusing to deal, and unfair methods of competition.

On April 1, 1992, one of the appellees, Olen L. Doddridge, d/b/a East End Body Shop, filed a motion to dismiss the complaint on the grounds that the State had failed to fully advise him of his rights and had breached its duty to deal with individuals with the "utmost good faith." The other appellees later joined in the motion to dismiss, and raised other grounds which they alleged warranted dismissal of the complaint.

A hearing on the motions to dismiss was held on May 15, 1992. After hearing the parties' arguments, the circuit court ultimately found that: (1) the Antitrust Act was quasi-criminal in nature; (2) the appellees had the right to know they were the target of an investigation, the right to know the nature of the allegations against them and the right to know they could have counsel; (3) the State did not afford the appellees their rights; and (4) the State did not conduct itself in accordance with its duties, and its actions in this case were "disgraceful, outrageous and not consistent with the standards of that office[.]" The circuit court dismissed the complaint with prejudice. The Attorney General appeals that order on behalf of the State.

## II

■ The State first contends that the trial court erred in finding that the Antitrust Act is quasi-criminal in nature.[1] In support of its assertion that the Antitrust Act is not quasi-criminal in nature, the

State relies on a test adopted by the United States Supreme Court in *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). The appellees, however, maintain that the trial court correctly concluded that the Antitrust Act was quasi-criminal in nature.

In the *Ward* case, the United States appealed a decision of the United States Court of Appeals for the Tenth Circuit which held that a proceeding for a civil penalty under the Federal Water Pollution Control Act is a criminal case within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination. In reversing that decision, the Supreme Court pointed out that the question of whether a particular statutorily defined penalty is civil or criminal in nature is a matter of statutory construction. 448 U.S. at 248–49, 100 S.Ct. at 2641, 65 L.Ed.2d at 749. The Court then followed a two-level inquiry:

> First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. See *One Lot Emerald Cut Stones v. United States, supra*, [409 U.S. 232,] at 236–237, 93 S.Ct. [489,] at 492–493 [, 34 L.Ed.2d 438]. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

As part of the second level of the inquiry, the Supreme Court tested the statutory scheme against the following standards set forth in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963), a case involving the issue of whether statutes which imposed automatic forfeiture of citizenship were penal in character:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only

---

**1.** Appellees David Lynn Geer, Royce Dale Geer and Geer Brothers Body Shop, Inc., acknowledge in their brief that the State Antitrust Act

"has no criminal provisions with all of the attendant procedural safeguards."

on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

■ Applying the first inquiry of the *Ward* test in the present case, we believe that the provisions of the Antitrust Act clearly reflect an intent by the legislature to have the Act serve as a civil remedy. To begin with, the legislature did not label either the investigation or the proceedings under the Antitrust Act as criminal. Although *W.Va.Code*, 47–18–7(a) [1978],[2] which sets forth the Attorney General's authority under the Antitrust Act, does not refer to the proceedings as criminal or civil, other provisions, specifically *W.Va.Code*, 47–18–10 [1978][3] and *W.Va.Code*, 47–18–12 [1978],[4] refer to the State's action under the Antitrust Act as a *civil* proceeding. Moreover, other sections of the Antitrust Act are clearly civil in nature, such as the provisions for: (1) injunctive relief, *W.Va. Code*, 47–18–8 [1978]; (2) damages, attorney's fees and treble damages,[5] *W.Va. Code*, 47–18–9 [1978]; (3) the four-year

2. We note that the actions taken by the Attorney General prior to the filing of any civil antitrust complaint are investigatory. Perhaps the investigatory power of the Attorney General under *W.Va.Code*, 47–18–7(a) [1978] is best compared to the authority of an administrative agency to investigate prior to making any charges of a violation of the law. For example, in *United States v. Morton Salt Co.*, 338 U.S. 632, 642, 70 S.Ct. 357, 364, 94 L.Ed. 401, 410–11 (1950), the United States Supreme Court discussed the duty of the Federal Trade Commission to inform itself and protect commerce against continued or renewed unlawful practice:

> The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the [Investigative] Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

3. *W.Va.Code*, 47–18–10 [1978] provides:

> A final judgment rendered in any *civil* proceeding brought by the State for violation of this article to the effect that a defendant has violated said article shall be prima facie evidence against such defendant in any proceeding brought by any other party against such defendant pursuant to section eight [§ 47–18–8] of this article, as to all matters with respect to which said judgment of decree would be an

estoppel as between the parties thereto: Provided, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken.
(emphasis added).

4. *W.Va.Code*, 47–18–12 [1978] provides, in relevant part: "Whenever any civil proceeding shall be commenced by the State to prevent, restrain or punish a violation of this article, the running of the statute of limitations ... shall be suspended during the pendency thereof and for one year thereafter[.]"

5. We note that the United States District Court for the Southern District of Iowa held, in *State of Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391 (S.D.Iowa 1968), that an action for treble damages under the antitrust statutes is quasi-criminal in nature.

However, in contrast, the United States Supreme Court has held, in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485–86, 97 S.Ct. 690, 696, 50 L.Ed.2d 701, 710 (1977), that the treble damages provision under the Clayton Act, which makes awards available only to injured parties in private antitrust actions, is designed primarily as a *remedy*. West Virginia's Antitrust Act, specifically *W.Va.Code*, 47–18–9 [1978], also allows private individuals to recover treble damages when injured by a violation of the Act.

Furthermore, other courts have recognized that treble damages do not constitute a criminal penalty. The Court of Appeals for the Eighth Circuit in *Crary v. Porter*, 157 F.2d 410, 414 (8th Cir.1946) explained the nature of treble damages:

> [m]ere increased or multiple damages, whether they be for exemplary or other public-interest purposes, whose allowance is dependent upon the recovery of actual damages, have never been regarded as constituting a criminal penalty. See 15 Am.Jur., Damages, § 267, p. 703. A penalty in a sense they may well be, in their practical significance perhaps

statute of limitations for bringing actions, *W.Va.Code*, 47–18–11 [1978]; and (4) the antitrust enforcement fund, *W.Va.Code*, 47–18–18 [1978] and 47–18–19 [1978]. Thus, we find that the Antitrust Act is comprised of provisions which clearly show the legislature's intention to establish a civil remedy for antitrust violations.

Having determined that the legislature intended the Antitrust Act to be a civil remedy, we must next consider, using the *Mendoza–Martinez* factors, whether its sanctions are so punitive as to transform it into a criminal penalty. Applying the *Mendoza–Martinez* factors to the statute on its face, we first find that the sanctions under the Antitrust Act do not involve an affirmative disability or restraint.[6] Next, as to whether the Antitrust Act has historically been considered as a punishment, we observe that monetary penalties under the Antitrust Act "are traditionally a form of civil remedy[.]" *Ward*, 448 U.S. at 256, 100 S.Ct. at 2645, 65 L.Ed.2d at 754 (Blackmun, J., concurring). *See Kimmelman v. Henkels & McCoy, Inc.*, 108 N.J. 123, 527 A.2d 1368, 1373 (1987).[7] Furthermore, there is no mention under our Antitrust Act that a finding of *scienter* must be made in order for the sanctions to "come into play." As to the fourth factor, although the imposition of monetary sanctions could be used to "promote traditional aims of punishment—retribution and deterrence," the fact that all money received by

the State is placed in the antitrust enforcement fund to cover the costs incurred by the State in the enforcement of the Antitrust Act is another persuasive indication that the statute is civil.[8] *Ward*, 448 U.S. at 256, 100 S.Ct. at 2645, 65 L.Ed.2d at 754 (Blackmun, J., concurring) (the fact that collected assessments under the Federal Water Pollution Control Act are deposited in a revolving fund used to defray the cost of cleanup operations is a strong indicator of the civil thrust of the statutory scheme). Finally, with respect to the sixth and seventh factors, the sole purpose of this statute thus far has been to restrain violations of the Antitrust Act, and we have not been presented with any set of facts which would indicate that it is excessive.

■ In the present case, only the fifth factor, which relates to whether the behavior under the Antitrust Act is already a crime, might support the appellees' argument that the Antitrust Act is quasi-criminal.[9] Under our Antitrust Act, there are no provisions recognizing violations of the statute as a crime, or providing for forfeiture of property or imprisonment upon violating the statute. Thus, a violation under our Antitrust Act only gives rise to a civil penalty.

■ The federal Antitrust Act, on the other hand, has separate sections providing

---

and to the defendant's mind no doubt, but in legal concept their allowance is simply an incident or part of the remedial sanction of damages. *Stockwell v. United States*, 13 Wall. 531, 547, 80 U.S. 531, 547, 20 L.Ed. 491, put it thus: 'There are many cases in which a party injured is allowed to recover in a civil action double or treble damages. * * * It will hardly be claimed that these are penal actions requiring the application of different rules * * * from those that prevail in other actions for indemnity.' To whatever extent, therefore, that it may be argued that double or treble damages in a civil action amount to a penalty, they are, unless the statute otherwise indicates, a mere remedial sanction and do not in any way make the action subject to the rules or privileges of a criminal prosecution.

6. The sanction's only "restraint" would involve injunctive relief to prevent or restrain violations of the Antitrust Act. *W.Va.Code*, 47–18–8

[1978]. The courts may also "grant injunctions reasonably necessary to restore and preserve competition in the trade or commerce affected by a violation of this article." *W.Va.Code*, 47–18–8 [1978].

7. In *Kimmelman*, the Supreme Court of New Jersey, relying on the *Ward* decision, held that its per diem penalty for companies' participation in a price-fixing scheme under its Antitrust Act was civil, and not criminal, in nature.

8. As for the damages received by private plaintiffs, see n. 5, *supra*.

9. We point out that this factor alone would not be sufficient to render the statute quasi-criminal in light of the fact that the other factors support its characterization as a civil penalty. *See Ward*, 448 U.S. at 257, 100 S.Ct. at 2645, 65 L.Ed.2d at 755 (Blackmun, J., concurring).

for both civil and criminal[10] violations. A violation under our state antitrust laws could possibly give rise to a violation under the federal civil and criminal antitrust laws.[11] However, the fact that the conduct which results in a violation of our Antitrust Act could also potentially be a violation of the criminal provisions under the federal Antitrust Act does not automatically render our state Antitrust Act quasi-criminal. Under our Antitrust Act, the legislature has specifically directed that the statute "be construed liberally and in harmony with ruling judicial interpretations of *comparable* federal antitrust statutes." *W.Va. Code*, 47–18–16 [1978] (emphasis added); *see also* syl. pt. 2, *Gray v. Marshall County Board of Education*, 179 W.Va. 282, 367 S.E.2d 751 (1988) (The courts of this state are directed by the legislature in *W.Va. Code*, 47–18–16 [1978] to apply the federal decisional law interpreting the Sherman Act, 15 U.S.C. § 1, to our own parallel antitrust statute, *W.Va.Code*, 47–18–3(a) [1978]). However, because the federal criminal antitrust provisions are not comparable to our state civil antitrust provisions, the rights afforded under the federal criminal antitrust provisions would not be applicable to our state civil antitrust statute.

▆▆▆ In summary, we hold that the question of whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction, and requires the application of a two-level inquiry adopted by the United States Supreme Court in *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). First, courts must determine whether the legislature indicated, either expressly or impliedly, a preference for labelling the statute civil or criminal. Second, if the legislature indicates an intention to establish a civil remedy, courts must consider whether the legislature, irrespective of its intent to create a civil remedy, provided for sanctions so punitive as to transform the civil remedy into a criminal penalty. As part of the second level of the inquiry, courts should be guided by the following factors identified by the United States Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963):

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

In the present case, we are not persuaded that any of the *Mendoza–Martinez* factors indicate that the West Virginia Antitrust Act is quasi-criminal. Therefore, we conclude that the proceedings conducted and the monetary penalties imposed under the West Virginia Antitrust Act, *W.Va. Code*, 47–18–1 to 47–18–23, as amended, are civil, and not quasi-criminal in nature.

### III

▆▆▆ The State next contends that the trial court erred in finding that the Antitrust Act and the *Constitution* afford a defendant the right to be apprised of the

---

**10.** Under the Sherman Act, specifically 15 U.S.C. § 1 (1988), "[e]very person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony[.]" Furthermore, under 15 U.S.C. § 2 (1988), "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony[.]"

**11.** The United States District Court for the Southern District of West Virginia pointed out in *Anziulewicz v. Bluefield Community Hospital, Inc.*, 531 F.Supp. 49, 53 (S.D.W.Va.1981): "Federal antitrust law is obviously directed toward *interstate* commerce. West Virginia's antitrust law is directed towards *intrastate* commerce." (emphasis in original).

Thus, we note that a violation of West Virginia's Antitrust Act may not necessarily give rise to a violation of the federal antitrust laws.

nature of the allegations against him, the right to know whether he is a target of an investigation, and the right to know that he should have counsel.[12] Appellee Doddridge contends that the Antitrust laws are so criminal in nature as to trigger the self-incrimination clause of the Fifth Amendment.[13] Appellees Galigher Ford, Inc. and Jacob C. Rardin argue that the same constitutional guarantees and safeguards provided under the Federal Antitrust Civil Process Act should also apply to proceedings under our state Antitrust Act.[14] David Lynn Geer, Royce Dale Geer and Geer Brothers Body Shop, Inc., charge that the Attorney General and his staff dissuaded the appellees from seeking legal counsel, and failed to advise the appellees that they were targets of an investigation.[15]

12. Olen Doddridge stated in his deposition that he asked the assistant attorney general, Donna Quesenberry, if he needed to have a lawyer present for his deposition, and that she responded "You can if you want, but you don't have to have."

13. We note that it does not appear from the record before us that any of the appellees invoked their Fifth Amendment privilege against self-incrimination, or that they were compelled to testify against themselves. However, we point out that some of the appellees in this case are business entities which have no privilege against self-incrimination. *Hyster Company v. United States*, 338 F.2d 183 (9th Cir.1964). *See also Shim v. Kikkoman International Corp*, 509 F.Supp. 736 (D.N.J.1981). We further point out that the fifth amendment privilege does not extend to the contents of documents which are obtained by compulsory process where such documents have been voluntarily prepared. Syl. pt. 9, *Marano v. Holland*, 179 W.Va. 156, 366 S.E.2d 117 (1988).

The United States Court of Appeals for the Fifth Circuit best explained the privilege against self-incrimination in antitrust cases in *In re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086, 1091–92 (5th Cir.1980):

The fifth amendment provides that '[n]o person ... shall be compelled in any criminal case to be a witness against himself....' This privilege against compulsory self-incrimination 'can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory....' *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). A witness may properly invoke the privilege when he 'reasonably apprehends a risk of self-incrimination, ... though no criminal charges are pending against him, ... and even if the risk of prosecution is remote.' *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 n. 5 (5th Cir.1979) (citations omitted).

The *Wehling* test indicates that a court must ordinarily make two inquiries to determine whether a witness is entitled to assert the privilege and refuse to respond to questioning. First, the court must determine whether answers to the questions might tend to reveal that the witness has engaged in criminal activities. If the answers could not be incriminatory, the witness must answer. *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). If answering the questions might incriminate the witness, the court must next ask whether there is a risk, even a remote risk, that the witness will be prosecuted for the criminal activities that his testimony might touch on. As the Seventh Circuit recently observed:

[This determination does not depend] upon a judge's prediction of the likelihood of prosecution. Rather, ... it is only when there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well taken.... When a witness can demonstrate any possibility of prosecution which is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster.

*In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir.1979) (citations omitted).

The Sixth Circuit further pointed out, however, that even if a witness establishes a reasonable fear of self-incrimination and prosecution, he or she may be compelled to testify if he or she is granted "use" immunity pursuant to 18 U.S.C. §§ 6001–6003. *See* 15 U.S.C. § 1312(i)(7)(B) (1988).

14. We note that Galigher Ford, Inc. and Jacob C. Rardin, IV, assert that "it is *obvious* that the State Attorney General used this particular civil litigation as a forum for his unsuccessful bid for the Democratic gubernatorial candidacy." (emphasis added). We find nothing "obvious" in the record to support this bald assertion of conjecture.

15. David Lynn Geer, Royce Dale Geer and Geer Brothers Body Shop, Inc. alleged in their brief that

[b]ecause autobody [sic] repairs are underwritten by insurance companies, it is *suspected* that the Attorney General had become a 'tool' of the insurance companies, who was being used by them to benefit their 'bottom lines' at the expense of the autobody [sic] repair industry. In their zeal to perform this function for the insurance industry, the Attorney General and his assistants ignored their ethical obligations as attorneys and trampled the rights of the small, relatively unsophisticated businesses involved.

First, with respect to whether a defendant in an antitrust case has the right to be apprised of the nature of the allegations against him or her, we can find no provisions under our Antitrust Act which give individuals who are the subject of a civil antitrust investigation such a right. We recognize, however, that under the federal Antitrust Civil Process Act, specifically 15 U.S.C. § 1312(b) (1988), the Attorney General is required, when issuing a civil investigative demand,[16] to state in the demand the nature of "the conduct constituting the alleged antitrust violation, ... which are under investigation and the provision of law applicable thereto[.]" The test as to whether the civil investigative demand complies with 15 U.S.C. § 1312(b) (1988) is "whether the statement in the demand as to the nature of the conduct under investigation is sufficient to inform *adequately the person being investigated and sufficient to determine the relevancy of the documents demanded for inspection."* *Gold Bond Stamp Company,* 221 F.Supp. 391, 397 (D.Minn.1963), *aff'd,* 325 F.2d 1018 (8th Cir.1964)[17] (emphasis in original). *See also Material Handling Institute, Inc. v. McLaren,* 426 F.2d 90 (3rd Cir.1970), *cert. denied,* 400 U.S. 826, 91 S.Ct. 50, 27 L.Ed.2d 55 (1970); *Lightning Rod Manufacturers Ass'n v. Staal,* 339 F.2d 346 (7th Cir.1964).

In the present case, the subpoenas issued by the Attorney General for documents and interrogatories contained the following closing paragraph:

This subpoena is being issued pursuant to the authority granted to the Attorney General by W.Va.Code § 47–18–7 (1986) in furtherance of an investigation into alleged anticompetitive practices in the automobile body repair services business. Such conduct may be violative of W.Va. Code §§ 47–18–3 (1986).

The subpoenas issued by the Attorney General requesting the appellees to appear for oral deposition stated:

This subpoena is being issued pursuant to the authority granted to the Attorney General by W.Va.Code § 47–18–7 (1986) to assist him in an investigation of possible contracts, combinations, or conspiracies to restrain trade or commerce in the autobody [sic] repair business in Cabell County, West Virginia, in violation of W.Va.Code § 47–18–3 (1986).

Notwithstanding the fact that our state Antitrust Act does not have a requirement similar to 15 U.S.C. § 1312(b), which requires the civil investigative demand to state the nature of the conduct constituting the alleged violation of the antitrust laws, we believe that the foregoing paragraph adequately informed the persons and corporations being investigated of the nature of the conduct constituting the violation.

Next, as to whether the appellees had the right to be informed that they were the target of an investigation, once again we find no provision under our Antitrust Act which requires the Attorney General to inform them that they are the subject of an investigation. Furthermore, while there is a requirement under the federal act to state the nature of the conduct constituting the alleged violation in the civil investigative demand, there does not appear to be a

---

(emphasis added). The record is devoid of any evidence to support these speculative assertions.

**16.** The Antitrust Civil Process Act empowers the Attorney General or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, to issue, prior to the initiation of any civil or criminal proceeding, a demand for documentary material relevant to a civil antitrust investigation. *United States v. International Business Machines Corp.,* 83 F.R.D. 97 (S.D.N.Y.1979); 15 U.S.C. § 1312 (1988). The purpose of the civil investigation demand procedure under the Antitrust Civil Process Act is to allow the antitrust division to investigate antitrust violations without prematurely becom-

ing involved in a full-blown litigation. *Associated Container Transportation (Australia) Ltd. v. United States,* 502 F.Supp. 505 (S.D.N.Y.1980).

**17.** The court also held in *Gold Bond* that the power granted the Attorney General under the federal antitrust statute did not violate the search and seizure clause of the Fourth Amendment to the *Constitution.* The Ninth Circuit reached the same conclusion in *Hyster Company v. United States,* 338 F.2d 183 (1964) (civil investigative demand under Antitrust Civil Process Act is not unreasonable search and seizure in violation of Fourth Amendment to the *Constitution* ).

provision which would require the civil investigative demand to state that the party is under investigation. *See Lightning Rod, supra* (no requirement under the act that the civil investigative demand state that the addressee is under investigation); *Hyster Company v. United States, supra* (civil investigative demand which stated that it was issued pursuant to the provisions of the Antitrust Civil Process Act was not required to state that corporation, on which demand was served, was under investigation). Thus, there is no requirement under either the state or federal antitrust statutes which would require the Attorney General to advise a party that he or she is the target of an investigation.

■ With respect to the appellees' arguments that they were entitled to be informed that they had a right to have counsel, we find that our Antitrust Act contains no such requirement. The federal Antitrust Civil Process Act, specifically 15 U.S.C. § 1312(i)(7)(A) (1988), does provide, however, that "[a]ny person compelled to appear under a demand for oral testimony pursuant to this section *may* be accompanied, represented, and advised by counsel." (emphasis added). That provision does not, however, require the Attorney General to inform any person compelled to appear for oral testimony that he or she may have counsel present.

■ Therefore, based on the discussion above, we conclude that the proceedings conducted and the monetary penalties imposed under the West Virginia Antitrust Act, *W.Va.Code*, 47–18–1 to 47–18–23, as amended, are civil, and not quasi-criminal in nature, and therefore, suspected violators of the Antitrust Act do not have the right to be informed that they are targets of an investigation nor do they have the right to be informed that they may have

counsel present at oral deposition. In subpoenas issued pursuant to an investigation under the Antitrust Act, the Attorney General should adequately inform suspected violators of the conduct constituting a violation of the Antitrust Act. We find that the subpoenas issued to the appellees in the present case by the Attorney General adequately informed them of the conduct constituting a violation of the Antitrust Act.

### IV

We conclude that the circuit court erred in dismissing this case with prejudice.[18] Thus, for the reasons set forth herein, we reverse the order of the circuit court and remand this case for further proceedings.[19]

Reversed and remanded.

---

**18.** It is not clear to this Court why the circuit court dismissed this case with prejudice, although the circuit court sharply criticized the Attorney General's conduct during the investigation. The motions before the circuit court were not for summary judgment pursuant to *W.Va. R.Civ.P.* 56, which would be a dismissal with prejudice. However, the State points out that, although the motions were designated as motions to dismiss, they brought in matters outside the pleadings and therefore, became motions

for summary judgment. We point out that a judgment sustaining a motion to dismiss under *W.Va.R.Civ.P.* 12(b) would be a dismissal without prejudice.

**19.** Because we are reversing this case, we do not address the issue raised by the State regarding the circuit court's consideration of certain affidavits.